**UNITED STATES of America, Plaintiff-Appellee,**

v.

**Harry HADDAD, Defendant-Appellant.**

**No. 77-1411.**

United States Court of Appeals, Ninth Circuit.

Aug. 10, 1977.

Harry Haddad, pro se.

Lawrence J. Semenza, U. S. Atty., Leland E. Lutfy, Asst. U. S. Atty., Las Vegas, Nev., submitted for plaintiff-appellee.

Kenneth C. Cory, Federal Public Defender, Daniel Markoff, Asst. Federal Public Defender, Las Vegas, Nev., on brief for defendant-appellant.

Before BARNES, WALLACE and SNEED, Circuit Judges.

SNEED, Circuit Judge:

Appellant Harry Haddad was convicted of one count of receipt by a felon of a firearm which has been shipped or transported in interstate commerce in violation of 18 U.S.C. § 922(h)(1).[1] On appeal, he contends that Congress did not intend for the statute to reach his conduct, and if it did, then it exceeded its power under the commerce clause. Furthermore, he asserts that the statute is unconstitutionally vague. He also challenges the trial court's finding that he lacked standing to attack the validity of the search which produced the firearm and that this search deprived him of his Fourth Amendment protection from unreasonable searches. We reject appellant's arguments and affirm the judgment of the trial court.

## I.

### FACTS.

Appellant was a registered guest at the Sands Hotel in Las Vegas, Nevada on September 27, 1976. That evening, in a manner which remains unclear, he received a pistol from Russell Angione, an investigator for the Clark County Public Defender. This pistol had traveled in interstate commerce from Springfield, Massachusetts to Las Vegas, Nevada, in June of 1971. It is undisputed that in 1970, appellant had been

---

1. 18 U.S.C. § 922(h)(1) provides that

    It shall be unlawful for any person—
        (1) who is under indictment for, or who has been convicted in any court of, a crime punishable for a term exceeding one year;

to receive any firearm or ammunition which has been shipped or transported in interstate or foreign commerce.

convicted in Connecticut of four counts of blackmail and sentenced to serve concurrent terms of six to ten years imprisonment.

That same evening, Sergeant James Palmer of the Sands Hotel Security was notified that appellant had been seen carrying a gun in the hotel. He found appellant in the hotel lobby at about 9:30 p. m. and told him not to carry a gun on the hotel premises. Appellant admitted to having a gun in his hotel room. Shortly thereafter, appellant left the hotel.

At approximately 10:00 p. m., Sergeant Dave Hansen of the Las Vegas Metropolitan Police Department, during a routine check of the casino, was also advised that appellant had been seen carrying a gun. He secured a key to appellant's hotel room and met with Palmer. They went to appellant's room and made a visual search of it to ascertain whether appellant was actually there.

Appellant returned to the hotel at approximately 11:00 p. m. Bucky Harris, the assistant casino manager, observed him carrying what appeared to be a pistol stuck inside his waistband. Harris testified that appellant admitted to him that he was carrying a pistol. Harris then informed Palmer of these developments, and Palmer placed appellant under surveillance. He observed appellant enter the elevator and go to the fourteenth floor, whereon his room was located. Approximately six or seven minutes later, appellant returned to the lobby and entered the Pavilion Bar.

Palmer then called Hansen to inform him of appellant's return to the hotel. When Hansen arrived, he and Palmer approached appellant and Hansen gave him a pat-down search which did not produce a gun. Appellant became unruly, so Hansen handcuffed him and placed him under arrest for disorderly conduct.

Hansen suggested to appellant that he leave town to avoid further problems. Appellant decided to check out of the hotel,

which he did, and was then read a trespass warning to the effect that if he returned to the hotel it would be considered a trespass under Nev.Rev.Stat. § 207.200 and he would be subject to arrest. Appellant also went to a cashier's cage where he withdrew approximately $13,000[2] which he had left there for safekeeping.

As appellant was withdrawing his money, Lieutenant Charleboix of the Las Vegas Metropolitan Police Department arrived. Charleboix, Hansen and Palmer, with appellant in tow, then searched appellant's room for the gun without success.

Charleboix and Hansen next drove appellant to a neighboring casino where appellant paid an outstanding debt. During the course of conversations between appellant and the police officers, appellant agreed to leave town. Accordingly, Charleboix and Hansen took appellant to the airport where he purchased a ticket to Los Angeles. The officers escorted him through the security checkpoint and released him from custody.

Meanwhile, Palmer returned to the hallway outside appellant's former room to look for the weapon. There he met the hotel maid who let him into the room as she entered to clean it. Palmer took this opportunity to search the room again, whereupon he found a 9 mm. Smith and Wesson automatic pistol hidden under a bedspread. Palmer notified the police of his discovery, and they rearrested appellant at the airport.

## II.

## CHALLENGES TO THE STATUTE.

### A. Scope of the Statute.

The interstate movement of the subject firearm occurred over five years prior to appellant's receipt in a transaction with which appellant had no connection. He contends that because he did not receive the firearm directly from interstate commerce and the interstate movement of the

---

**2.** It is unclear from the evidence whether appellant withdrew $13,000 or $15,000 from the cashier.

firearm was removed in time from his receipt, his conduct was beyond the intended scope of the statute. His argument must fail in light of the recent Supreme Court decision in *United States v. Barrett*, 423 U.S. 212, 96 S.Ct. 498, 46 L.Ed.2d 450 (1976), where the Court held that section 922(h) applied to the receipt of a firearm by a felon in an intrastate transaction which was preceded by an interstate transaction.

Appellant attempts to distinguish *Barrett* on the ground that it involved the purchase from a retailer who dealt in interstate commerce, whereas he received a firearm from a private party who had no connection with interstate commerce. *Barrett* may not be read so narrowly. The Court cited three reasons for its holding, all of which apply with equal force to the facts before us. First, the statutory language "is without ambiguity". *Id.* at 216, 96 S.Ct. 498, 501. This language places within the reach of the statute the receipt of any firearm which "has been shipped or transported in interstate or foreign commerce." There is no reason to limit this language to direct interstate receipt or receipt from one who deals in interstate firearm transactions. Second, the Court noted that the structure of the Gun Control Act of 1968, of which section 922(h) is a part indicates an intent not merely to prohibit certain interstate transactions in firearms, but to remove firearms from the hands of persons Congress felt were dangerous, to wit, felons. The Court listed as its third reason the legislative history of the Gun Control Act and of Title IV of the Omnibus Crime Control and Safe Streets Act of 1968, which the Gun Control Act amended. This legislative history also supports the interpretation of the Congressional intent derived from the structure of the Act. The proximity of the felons receipt of the firearm to interstate commerce has little relationship to the accomplishment of the statutory goal. Appellant's receipt of the pistol clearly falls within the intended reach of section 922(h). *See also Scarborough v. United States*, —— U.S. ——, 97 S.Ct. 1963, 52 L.Ed.2d 582 (1977).

B. Constitutionality of the Statute.

1. The Commerce Clause.

▮ Having rejected appellant's first statutory argument, we turn now to his second in which he claims that the application of section 922(h) to his receipt of the subject firearm exceeds the bounds of the commerce clause. He argues that his receipt of the firearm five years after its interstate movement neither bears any relationship to nor affects interstate commerce and thus is beyond the reach of Congress under the commerce clause. We disagree. We hold that section 922(h) as applied here is constitutional.

Although *Barrett* does not directly address appellant's constitutional argument, its holding by implication rejects it. In *Barrett*, the Court was faced with recent dictum in *United States v. Bass*, 404 U.S. 336, 92 S.Ct. 515, 30 L.Ed.2d 488 (1971) which suggested that section 922(h) applied only to the receipt of any firearm or ammunition as a part of an interstate transaction. The source of this dictum was *Tot v. United States*, 319 U.S. 463, 63 S.Ct. 1241, 87 L.Ed. 1519 (1943), where the Court in interpreting the predecessor of section 922(h) stated:

> [T]he Act is confined to the receipt of firearms or ammunition as a part of interstate transportation and does not extend to the receipt, in an intrastate transaction, of such articles which, at some prior time, have been transported interstate.

*Id.* at 466, 63 S.Ct. at 1244.

As already indicated, the Court refused to accept this interpretation and held that section 922(h) does apply to the intrastate receipt of a firearm which previously had traveled interstate. Inasmuch as the Court would not have interpreted section 922(h) in an unconstitutional manner, *see Ashwander v. Tennessee Valley Authority*, 297 U.S. 288, 348, 56 S.Ct. 466, 80 L.Ed. 396 (1936) (concurring opinion of Justice Brandeis), it follows that a prior interstate transfer of a firearm provides a sufficient interstate nexus to justify federal proscription of its subsequent receipt by a felon.

This conclusion is supported by *United States v. Bass, supra.* In *Bass,* the Court explained the necessary interstate nexus for 18 U.S.C.App. § 1202(a), which proscribes receipt by, among others, a felon of any firearm "in commerce or affecting commerce." The requisite nexus consisted of a showing that "the firearm received has previously traveled in interstate commerce." *United States v. Bass,* 404 U.S. at 350, 92 S.Ct. at 524; *see United States v. Lathan,* 531 F.2d 955 (9th Cir. 1976); *United States v. Giannoni,* 472 F.2d 136 (9th Cir.) *cert. denied,* 411 U.S. 935, 93 S.Ct. 1911, 36 L.Ed.2d 396 (1973). The Court perceived no constitutional problem with such a broad interpretation of "in commerce or affecting commerce."

The insubstantial effect on interstate commerce of appellant's receipt of the firearm here involved does not remove it from the reach of federal law. Congress was aware of the large number of "crime guns" which are obtained through interstate channels. S.Rep.No. 1097 90th Cong., 2d Sess., 77–78, *reprinted in* [1968] U.S. Code Cong. & Admin. News pp. 2112, 2164–65. In passing the Act, it intended to dry up this supply completely for the felon. *Id.* at 28, U.S. Code Cong. & Admin. News at 2113. If felons could legally receive firearms by simply washing them through a series of intrastate transfers, the Congressional purpose would be frustrated. Congress may reach these intrastate activities which "interfere with or obstruct" the attainment of its legitimate goal. *United States v. Wrightwood Dairy Co.,* 315 U.S. 110, 119, 62 S.Ct. 523, 86 L.Ed. 726 (1942). Unproscribed receipts of firearms in intrastate transactions would affect interstate commerce by increasing the interstate demand for weapons. The fact "that appellant's own contribution to the demand . . . may be trivial by itself is not enough to remove him from the scope of federal regulation where, as here, his contribution, taken together with that of many others similarly situated, is far from trivial." *Wickard v. Filburn,* 317 U.S. 111, 127–28, 63 S.Ct. 82, 90, 87 L.Ed. 122 (1942); *see Perez v. United States,* 402 U.S. 146, 91 S.Ct. 1357, 28 L.Ed.2d 686 (1971); *United States v. Day,* 476 F.2d 562 (6th Cir. 1973); *United States v. Bonanno,* 467 F.2d 14 (9th Cir. 1972), *cert. denied,* 410 U.S. 909, 93 S.Ct. 964, 35 L.Ed.2d 271 (1973).

We are aware that 18 U.S.C. § 922(h)(1), as here construed, may be thought to encroach on a state's criminal jurisdiction. *See United States v. Bass, supra.* No doubt it will, in many cases, overlap with state statutes barring receipt of a firearm by a felon. However, some overlap is unavoidable and necessary to ensure the fulfillment of the principal purposes behind the Act, *see Westfall v. United States,* 274 U.S. 256, 47 S.Ct. 629, 71 L.Ed. 1036 (1927), which are

> to keep firearms out of the hands of those not legally entitled to possess them because of age, criminal background, or incompetency, and to assist law enforcement authorities in the States and their subdivisions in combating the increasing prevalence of crime in the United States.

S.Rep.No. 1097, *supra* at 28, U.S. Code Cong. & Admin. News, *supra* at 2113–14. We view this section not as an encroachment on, but rather a complement to, state regulation. The Senate report indicates that a substantial number of "crime guns" are obtained from out-of-state sources, which are beyond the reach of any state regulation. S.Rep.No. 1097, *supra* at 77–78, U.S. Code Cong. & Admin. News, *supra* at 2164–65. Thus, the federal regulation, which to be effective must extend to some extent to intrastate transactions, plugs serious gaps in, and meshes with, state regulation to snare the armed felon.

The constitutional legitimacy of restricting interstate demand of firearms by felons makes it unnecessary for us to rest constitutionality, as some courts have done, on such factors as the high incidence of recidivism, the high percentage of violent crimes involving firearms, and the effect violent crime has on interstate commerce. *E. g., Stevens v. United States,* 440 F.2d 144 (6th Cir. 1971); *United States v. Synnes,* 438 F.2d 764 (8th Cir. 1971), *vacated,* 404 U.S. 1009, 92 S.Ct. 687, 30 L.Ed.2d 657 (1972).

Reliance on such factors suggests that the commerce clause permits the exercise of federal criminal jurisdiction over any violent crime.[3] An extension of this magnitude would "dramatically [intrude] upon traditional state criminal jurisdiction." *United States v. Bass,* 404 U.S. at 350, 92 S.Ct. at 524. We do not wish to be understood as contributing to any such intrusion.

### 2. Vagueness.

■ Appellant argues that section 922(h)(1) is unconstitutionally vague because it is unclear from the statute whether it requires knowledge of receipt to support a conviction. His argument is without merit. It is clear from the wording of the statute that knowledge is not an element of the crime, mere receipt is enough. Nor is the statute deficient for failing to require knowledge. *See United States v. Crow,* 439 F.2d 1193 (9th Cir. 1971), *vacated,* 404 U.S. 1009, 92 S.Ct. 687, 30 L.Ed.2d 657 (1972). The fact that Congress made knowledge an element of other portions of section 922 supports our conclusion that section 922(h) is without ambiguity.[4]

### III.

### THE SEARCH.

The trial court found that because the hotel had good cause to eject appellant forcibly from its premises appellant had no standing to challenge a search of his room subsequent to his ejection. The trial court did not reach the issue of the legality of the search. Appellant challenges this holding on two grounds: (1) he had "automatic"

standing under *Jones v. United States,* 362 U.S. 257, 80 S.Ct. 725, 4 L.Ed.2d 697 (1960) because he was charged with a possessory crime, and (2) he had a reasonable expectation of privacy and a proprietary interest in the room which was searched. With respect to the legality of the warrantless search, appellant insists that the casino employee Palmer conducted the search as an agent of the Las Vegas police and consequently the Fourth Amendment invalidates the search. We affirm the trial court's conclusion on the standing question. It, therefore, is not necessary to confront the question of the legality of the search.

### A. Automatic Standing.

■ Appellant is not entitled to automatic standing. Automatic standing is limited to those cases where the defendant is charged with an offense an essential element of which is possession of the seized evidence at the time of the search. *Brown v. United States,* 411 U.S. 223, 228–29, 93 S.Ct. 1565, 36 L.Ed.2d 208 (1973); *Jones v. United States,* 362 U.S. at 263–64, 80 S.Ct. 725; *United States v. Jamerson,* 549 F.2d 1263, 1267 (9th Cir. 1977). The present justification for the doctrine is that it prevents the government from taking inconsistent positions during the course of the prosecution. Absent the doctrine, the government could avoid the strictures of the Fourth Amendment by denying that the defendant possessed the seized substance while simultaneously charging him with such possession. *Brown v. United States, supra; see United States v. Jamerson, supra.*[5] No such opportunity exists in

---

3. *See* Stern, *The Commerce Clause Revisited— The Federalization of Intrastate Crime,* 15 *Ariz. L.Rev.* 271, 283 (1973).

4. *See, e. g.,* 18 U.S.C. § 922(k):
   It shall be unlawful for any person knowingly to transport, ship, or receive, in interstate or foreign commerce, any firearm which has had the importer's or manufacturer's serial number removed, obliterated, or altered.

5. The Supreme Court originally fashioned the rule of automatic standing to combat the self-incrimination dilemma as well as the vice of prosecutorial self-contradiction which appeared in cases where possession at the time of

the search was an essential element to the offense charged. *Jones v. United States, supra; Brown v. United States,* 411 U.S. 223, 93 S.Ct. 1565, 36 L.Ed.2d 208 (1973). In such a case a defendant was forced to allege possession to have standing, yet this admission of possession would later be used to convict him. Rather than leave a defendant in this predicament, the Court afforded automatic standing to defendants facing this dilemma. The Supreme Court solved this dilemma in *Simmons v. United States,* 390 U.S. 377, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968), by holding that a defendant's testimony at the suppression hearing relative to his possession at the time of the search is inadmis-

the case at bar. It is not necessary to establish that appellant possessed the pistol at the time of the search. Prior receipt of the firearm which previously traveled in interstate commerce is all that was necessary to support the conviction. Automatic standing, therefore, is not available.

### B. Actual Standing.

■ Appellant also argues that even if he did not have automatic standing, he had actual standing derived from his possessory interest and reasonable expectation of privacy in the room. He insists that the involuntary relinquishment of control of the room did not deprive him of this interest and expectation. We disagree.

To establish standing, appellant must establish that he had a possessory interest in the hotel room sufficient to support a reasonable expectation of privacy. *See United States v. Jamerson*, 549 F.2d 1263 (9th Cir. 1977). "[H]e himself [must have been] the victim of an invasion of privacy." *Jones v. United States*, 362 U.S. 257, 261, 80 S.Ct. 725, 731, 4 L.Ed.2d 697 (1960); *accord United States v. Croft*, 429 F.2d 884 (10th Cir. 1970). In this determination, we are not bound by rigid rules governing proprietary interests; rather, we look to the individual's right to privacy. *Jones v. United States, supra; United States v. Parizo*, 514 F.2d 52 (2d Cir. 1975).

Appellant had no reasonable expectation of privacy with respect to a room from which he had been *justifiably* ejected. Whether his checking out was *voluntary* is irrelevant. Once ejected for good cause, the room reverted to the control of the management, and the former occupant had no continuing right to privacy in the room. In this sense, a justified ejection is no different than a termination of the rental period, when "the guest has completely lost the right to use the room and any privacy associated with it." *United States v. Croft*, 429 F.2d at 887; *accord, United States v. Parizo, supra.*

The lack of an invasion of appellant's privacy is even more obvious from the facts of this case. When appellant checked out, he told Palmer that he did not want any belongings he might have left in the room.[6] After this statement, it is difficult to imagine that appellant actually entertained any reasonable expectation of privacy with respect to the room.

The trial court found that the appellant was ejected for good cause. This finding is not clearly erroneous. Appellant had been seen on several occasions carrying a gun in the hotel. Furthermore, when searched by the police, he created such a disturbance that he was arrested for disorderly conduct and was handcuffed. There also was evidence indicating that he was intoxicated. These facts gave the hotel just cause to eject him.

Appellant, therefore, has no actual standing to challenge the legality of the search which led to the discovery of the firearm,

sible at trial. Thus only the vice of prosecutorial self-contradiction remains to justify the continued use of the automatic standing of *Jones.* The Court in *Brown* left open the question of whether this problem standing alone warranted the continued survival of the doctrine. *Brown v. United States*, 411 U.S. at 229, 93 S.Ct. 1565.

**6.** Even assuming that appellant had standing and that Palmer was an agent of the police as well as the hotel, we conclude that appellant had abandoned any articles left in his room and therefore his challenge to the search must fail. "The proper test for abandonment is not whether all formal property rights have been relinquished, but whether the complaining party retains a reasonable expectation of privacy in the articles alleged to be abandoned." *United States v. Wilson*, 472 F.2d 901 (9th Cir.), *cert. denied*, 414 U.S. 868, 94 S.Ct. 176, 38 L.Ed.2d 116 (1973). Faced with ejection from

the hotel, appellant declined to remove his personal effects from the room. The hotel management at that point had the right to enter and hold such discarded articles as it might find. Under these facts, appellant had no reasonable expectation of privacy in the pistol he purposefully left behind. *See Abel v. United States*, 362 U.S. 217, 80 S.Ct. 683, 4 L.Ed.2d 668 (1960).

Assuming also the illegality of the first two searches, we find that they did not taint the successful third search. The pistol was not found as a result of the exploitation of the prior illegal searches. *Wong Sun v. United States*, 371 U.S. 471, 438, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963). The police learned nothing in the third search. The mere existence of fruitless unlawful searches does not taint a subsequent lawful one.

the receipt of which constitutes the heart of the offense for which the appellant was convicted.

AFFIRMED.