**UNITED STATES of America, Appellee,**

v.

**Theodore Duane WYNDE, Appellant.**

**No. 77–1930.**

United States Court of Appeals, Eighth Circuit.

Submitted Feb. 13, 1978.

Decided June 26, 1978.

Rehearing and Rehearing En Banc Denied July 24, 1978.

Drew C. Johnson (argued), Maloney, Kolker, Fritz, Hogan & Johnson, filed briefs, Aberdeen, S.D., for appellant.

David V. Vrooman, U. S. Atty., Sioux Falls, S.D., for appellee.

Before HEANEY and STEPHENSON, Circuit Judges, and BECKER,* Senior District Judge.

WILLIAM H. BECKER, Senior District Judge.

This is an appeal from a judgment of conviction of the appellant (defendant) Wynde by a jury in the United States District Court for the District of South Dakota.[1] The defendant was convicted of a violation of § 922(h),[2] Title 18, United States Code (§ 922(h)), prohibiting receipt, by a convicted felon, of a firearm previously shipped or transported in interstate commerce.

§ 922(h) is a part of the Gun Control Act of 1968, Pub.L. No. 90–618 (Oct. 22, 1968), 3 U.S.Code, Cong. and Admin.News, 90th Congress, Second Session, p. 4410, Title I, § 102, 82 Stat. 1216, which amended the Omnibus Crime Control and Safe Streets Act of 1968, Pub.L. No. 90–351 (June 19, 1968), 2 U.S.Code, Cong. and Admin.News, 90th Congress, Second Session, p. 2112, Title IV, § 902, 82 Stat. 228.

### Material Facts

On July 7, 1977, a Federal Grand Jury returned an indictment charging the defendant with a violation of § 922(h). The defendant pleaded not guilty to the charge of the indictment, but thereafter was found guilty by the verdict of the jury (R. 194). The defendant filed post-trial motions for judgment of acquittal and, in the alternative, for a new trial (T.[3] 2). The court denied these motions (PT.[4] 122–125). This appeal followed.

The evidence viewed in the light most favorable to the appellee follows.

Counsel for both parties stipulated that the defendant had been convicted of a crime punishable by imprisonment for a term exceeding one year, specifically, that on August 5, 1971, the defendant was convicted in a South Dakota Circuit Court of assault with a dangerous weapon without the intent to kill (R. 4).

On December 7, 1976, the Four Seasons Sports Center, in Webster, South Dakota, received a Model 190 Winchester .22 rifle, serial number 1963117, from the Northland Sports and Supply of Minot, North Dakota (Government's Exhibits 2 & 3; R. 7–11). This serial number is unique among Winchester firearms (R. 112). On May 16, 1977, Earl Evans purchased the same rifle at the Four Seasons Sports Center (R. 14). At the request of Jean Wynde, wife of the defendant, Evans loaned the rifle to Jean Wynde on May 31, 1977 (R. 16, 130). Jean Wynde borrowed the rifle in order that Nicco, one of her sons, could shoot gophers (R. 129–130). Evans laid the firearm in the back end of a blue Ford station wagon belonging to Jean Wynde (R. 17, 131–132). During the period May 31 to June 2, 1977, no one used the rifle in the presence of Jean Wynde (R. 130).

At approximately 12:00–12:30 a. m., June 2, 1977, Robert J. Hopkins (Hopkins) went from Don's Bar to the Fireside Bar, both in Waubay, South Dakota (R. 37–38). Between 12:30 and 1:00 a. m., Hopkins returned to Don's Bar and bought a case of beer (R. 40). Hopkins then invited the defendant, Jean Wynde, Harriet Keeble, and Charles Owen (all of whom were at the Fireside Bar) to drink the beer with him later that evening (R. 26, 40). Hopkins and the defendant put the beer in Jean Wynde's

---

* The Honorable William H. Becker, Senior United States District Judge for the Western District of Missouri, sitting by designation.

1. The Honorable Fred J. Nichol, Chief United States District Judge, presiding.

2. The statute reads, in the material part:
    (h) It shall be unlawful for any person—
    (1) *who is under indictment for, or who has been convicted in any court of, a crime*

*punishable by imprisonment for a term exceeding one year; . . .*
*to receive any firearm or ammunition which has been shipped or transported in interstate or foreign commerce.*

3. "T" refers to the original post-trial transcript, beginning with numbered page 1.

4. "PT" refers to the December 2, 1977, post-trial transcript which also began with numbered page 1.

station wagon, locked the doors, and rolled up the windows of the station wagon (R. 40).

That morning at approximately 1:00 to 1:30 a. m., before the closing of the Fireside Bar, Hopkins, the defendant, Jean Wynde, Harriet Keeble, and Charles Owen went to Jean Wynde's station wagon (R. 24–25). There they discovered that the right front window of the station wagon had been broken, and that the beer had been stolen (R. 26–27). Someone said that Kenny Fayant and Russell Owen had taken the beer (R. 27). Harriet Keeble testified that Hopkins told them that Wilford Fayant's two sons had done it (R. 59–60). The defendant was upset; he said "we was going to get whoever did it" (R. 27, 53–54, 156). The defendant, Jean Wynde, Hopkins, Keeble, and Owen got into the station wagon[5] and drove to the home of Wilford Fayant (Fayant), father of Kenny Fayant (R. 28–29). The defendant was the driver (R. 27).

They arrived at the Fayant residence at 6:00 a. m. The defendant stopped the station wagon about 150 to 200 yards from the house (R. 28–29, 44). Hopkins testified that the defendant took the rifle from the front seat of the station wagon, loaded it with "shells" (cartridges), and fired a shot[6] at the Fayant house[7] (R. 30). Both the defendant and his wife testified that there were no other firearms in the car (R. 144–145, 166). Hopkins testified that the rifle,

Government's Exhibit 3, resembled the rifle fired by the defendant (R. 33).

Fayant walked to the car and talked to the defendant. They argued (R. 31). Fayant told the defendant that he would pay for the broken window (R. 82). Fayant could tell that the defendant had been drinking (R. 86). He saw a .22 Winchester rifle lying across the defendant's lap (R. 83).[8]

The defendant, sitting in the driver's seat, struck Fayant in the face (R. 32). Fayant turned and walked toward the house. The defendant again fired the rifle (R. 33). When this shot was fired, Fayant was opening the house door. The bullet struck the house approximately two feet from where Fayant was standing (R. 84).

That same morning, Kerry Nelson (Nelson), nephew of the defendant, saw the defendant in a trailer house at the Enemy Swim Housing, which is in an Indian District (R. 90–91). The defendant removed a rifle and jacket from the front seat of Jean Wynde's station wagon and gave them to Nelson (R. 91–92). Nelson testified that the rifle resembled Government's Exhibit 3 (R. 92). Nelson then took the firearm to the house of his grandmother, Vivian Wynde, the defendant's mother, where Nelson was staying, and put it under the bed in his bedroom (R. 92–93). That afternoon Nelson turned the rifle over to Mr. DeCoteau, a tribal officer (R. 94).

---

5. Jean Wynde and the defendant testified that Hopkins and Owen did not get into the station wagon; that Jean Wynde, the defendant, and Harriet Keeble left the Fireside Bar at approximately midnight; that they spent the night at Keeble's house, and left the morning of June 2 between 6:00 and 7:00 a. m.; and that at Waubay, they picked up Owen and Hopkins, who were drunk (R. 133–134, 156–157, 164).

6. Jean Wynde and the defendant testified that the rifle fired accidentally when Jean Wynde tried to extricate it from underneath her legs, and that there was only one shot (R. 135–136, 160). Harriet Keeble, the defendant's half-sister, testified that she told David Ganje, former counsel for the defendant, that the firearm accidentally discharged when Jean Wynde was in the process of putting it into the rear seat of the car (R. 56, 72).

7. Only Hopkins testified that the defendant fired the first of two shots. The defendant,

Jean Wynde, and Harriet Keeble testified that Jean Wynde accidentally discharged the rifle. See note 6 supra. Fayant makes no mention of this first shot, and only later did he discover the otherwise unexplained bullet hole in his bedroom wall (R. 86–88). Charles Owen testified that he could not recall what transpired at the Fayant residence (R. 77–78).

8. Initially, Fayant told Officer Trottier that Government's Exhibit 3 was the rifle used by the defendant on June 2, 1977. Fayant testified, however, that the rifle he saw on June 2, 1977, had an engraved stock, and did not resemble Government's Exhibit 3 (R. 83). In subsequent affidavits procured by the prosecution and defense, Fayant stated that he was not sure whether Government's Exhibit 3 and the rifle he saw on June 2, 1977, were one and the same (PT. 61–62).

Again that same morning, Eugene H. Trottier, criminal investigator for the Bureau of Indian Affairs, received a radio message concerning the shooting, interviewed Fayant, and arrested the defendant at the Enemy Swim Housing pursuant to a complaint charging the defendant with assault with a dangerous weapon, a violation of §§ 1153 and 113(c), Title 18, U.S.C. (R. 97–98; Appellee's Br., p. 5). Trottier removed seven empty cartridge cases from the front seat of Jean Wynde's station wagon (R. 98–99). Subsequently, he and Officer DeCoteau recovered the rifle, Government's Exhibit 3, at the Vivian Wynde residence. The rifle had five cartridges in it, and was free of fingerprints (R. 100, 104–105). Richard Schmidt, Special Agent of the F.B.I. and a firearms identification specialist in a F.B.I. Laboratory, testified that the cartridge cases found in the station wagon had been fired from the rifle (R. 109, 111). Mr. Schmidt also testified that Winchester did not have a firearms manufacturing plant in South Dakota (R. 112).

On or about October 25, 1977, after the defendant was found guilty by verdict of the jury, Vivian Wynde, the defendant's mother, asked Ms. Fern Mathias, who worked for the Wounded Knee Legal Defense-Offense Committee and for the Sisseton Indian Education Committee, to help in her son's defense (PT. 70–71, 102). Drew C. Johnson, counsel for the defendant, also requested the assistance of Ms. Mathias (PT. 102). The brother of Ms. Mathias, Milton Eastman, gave her copies of F.B.I. and B.I.A. (Bureau of Indian Affairs) reports containing pre-trial interviews with the witnesses (PT. 92).

The same day, Ms. Mathias asked several of the witnesses if the reports accurately related what they had told the law enforcement authorities. Ms. Mathias made "findings" that were then conveyed to the defendant's counsel, Drew C. Johnson; Mr. Johnson prepared six affidavits for execution by Vivian Wynde, Milton Eastman, Charles Owen, Harriet Keeble, Hopkins, and Fayant, based upon the "findings" of Ms. Mathias. On November 2, 1977, these affidavits were executed, filed, and served

in support of the hearing of the defendant's post-trial motions (PT. 93–94; Appellee's Br., p. 9). The post-trial motions accused Assistant United States Attorney Bruce Boyd, F.B.I. Agent Bryan Mogen, and B.I.A. Agency Special Officer Eugene Trottier of investigative and prosecutorial improprieties (PT. 16, 31, 36–37; Appellee's Br., p. 9). Upon motion of the Government, the court granted a continuance in order to permit an investigation of these accusations (T. 18–19; Appellee's Br., p. 9).

David V. Vrooman, United States District Attorney for the District of South Dakota, instructed David G. Flanders, Assistant Special Agent in charge of the Minneapolis Division of the F.B.I., to interview the six original affiants under oath concerning the truthfulness of the statements made in their affidavits. Mr. Flanders interviewed and obtained signed sworn statements from Bruce Boyd, Bryan Mogen, and Eugene Trottier, and from five of the original affiants, Vivian Wynde, Milton Eastman, Charles Owen, Hopkins, and Fayant (PT. 3–4, Appellee's Br., p. 10). Harriet Keeble, the sixth original affiant, was interviewed and asked by Mr. Flanders to make a sworn statement, but she refused to comply with the request.

Resumed post-trial hearings were held on December 2, 1977. David V. Vrooman, who had not participated in the trial, represented the Government at the resumed post-trial hearings. The sworn statements obtained by F.B.I. Agent Flanders were received in evidence. These sworn statements refuted the material allegations made in affidavits submitted by the defense counsel at the November 2, 1977, hearing (PT. 21, 24–25, 31–32, 37–38; Appellee's Br., pp. 9–15). On this basis the court concluded that there was no evidence indicating that Bruce Boyd, the prosecuting attorney at trial, had committed any prosecutorial improprieties or subornation of perjury. Counsel for the defendant concurred (PT. 116–117). The court denied the defendant's motions for judgment of acquittal and, in the alternative, for a new trial (PT. 122–125).

The defendant was sentenced and committed to the custody of the Attorney General for a period of three years (PT. 132). Counsel for the defendant filed a timely appeal on December 5, 1977.

### Issues Presented

The parties agree that the issues presented for appeal are:

I. Whether § 922(h) is unconstitutional in that it denies the defendant equal protection of the law.

II. Whether as a matter of law there is sufficient evidence to support the verdict of the jury.

III. Whether the Government must establish that the defendant received the firearm prior to any intervening intrastate movement of it.

IV. Whether the trial court erred in not giving the defendant's proposed instruction concerning the elements of the crime.

V. Whether the trial court erred in denying the defendant's motions for judgment of acquittal and, in the alternative, for a new trial.

### I. The Equal Protection of Law Issue

■ The defendant claims that because an element of the crime, defined by § 922(h), is that the firearm received by the defendant previously must have been either shipped or transported in interstate commerce, some convicted felons in the state of manufacture may, under § 922(h), legally receive firearms that have not been shipped or transported in interstate commerce, while other convicted felons are criminally liable if they receive firearms that previously have been shipped or transported in interstate commerce. The defendant submits that this distinction constitutes a violation of his federal constitutional right to equal protection of the law.

■ The Fifth Amendment does not contain an express equal protection clause. Nevertheless, it prohibits discrimination that is so unjustifiable as to be in contravention of due process. *Johnson v. Robison*, 415 U.S. 361, 364 n. 4, 94 S.Ct. 1160, 1164, 39 L.Ed.2d 389, 396 (1974), and cases therein cited. Equal protection principles are inherent in the due process clause of the Fifth Amendment. *Mathews v. De Castro*, 429 U.S. 181, 182 n. 1, 97 S.Ct. 431, 432, 50 L.Ed.2d 389, 392 (1976). In *Hampton v. Mow Sun Wong*, 426 U.S. 88, 100, 96 S.Ct. 1895, 1903, 48 L.Ed.2d 495, 506–507 (1976), Mr. Justice Stevens describes this dual aspect of the Fifth Amendment as follows:

> The federal sovereign, like the States, must govern impartially. The concept of equal justice under law is served by the Fifth Amendment's guarantee of due process, as well as by the Equal Protection Clause of the Fourteenth Amendment. Although both Amendments require the same type of analysis, see *Buckley v. Valeo*, 424 U.S. 1, 93, 96 S.Ct. 612, 670, 46 L.Ed.2d 659, 730 (Jan. 30, 1976), . . . the two protections are not always coextensive. Not only does the language of the two Amendments differ, but more importantly, there may be overriding interests which justify selective federal legislation that would be unacceptable for an individual State.

An analysis of the equal protection of the law contention of the defendant requires a determination of whether the challenged legislative classification rests on a rational basis and does not impermissibly infringe on the exercise of a fundamental right [9] or peculiarly disadvantage a suspect class.[10] In determining the impermissible infringement questions, strict scrutiny is required. *Maher v. Roe*, 432 U.S. 464, 470, 97 S.Ct. 2376, 2380–2381, 53 L.Ed.2d 484, 492 (1977), quoting from *San Antonio School District v. Rodriguez*, 411 U.S. 1, 17, 93 S.Ct. 1278, 1288, 36 L.Ed.2d 16, 33 (1973), *reh. denied,*

---

9. *See Massachusetts Bd. of Retirement v. Murgia*, 427 U.S. 307, 312 n. 3, 96 S.Ct. 2562, 2566, 49 L.Ed.2d 520, 524 (1976), and cases cited therein.

10. *See Massachusetts Bd. of Retirement v. Murgia, supra,* l. c. 312 n. 4, 96 S.Ct. l. c. 2566, 49 L.Ed.2d l. c. 524, and cases cited therein.

411 U.S. 959, 93 S.Ct. 1919, 36 L.Ed.2d 418 (1973); *Massachusetts Bd. of Retirement v. Murgia*, 427 U.S. 307, 312, 96 S.Ct. 2562, 2566, 49 L.Ed.2d 520, 524 (1976). The rational basis test has been described in *Ohio Bureau of Employment Serv. v. Hodory*, 431 U.S. 471, 489, 97 S.Ct. 1898, 1909, 52 L.Ed.2d 513, 527 (1977), as follows:

"We turn then to examine this state classification under the rational-basis standard. This inquiry employs a relatively relaxed standard reflecting the Court's awareness that the drawing of lines that create distinctions is peculiarly a legislative task and an unavoidable one. Perfection in making the necessary classifications is neither possible nor necessary. *Dandridge v. Williams*, [397 U.S. 471, 90 S.Ct. 1153, 25 L.Ed.2d 491], at 485, [90 S.Ct. 1153, 25 L.Ed.2d 491]. Such action by a legislature is presumed to be valid."

We conclude that § 922(h) does not deprive the defendant of equal protection of the law. § 922(h) has withstood repeated constitutional attacks. E. g., *United States v. Ocegueda* (C.A. 9, 1977) 564 F.2d 1363, 1365–1367 (holding that § 922(h)(3) is neither vague under the due process clause of the Fifth Amendment nor in contravention of the Eighth Amendment); *United States v. Haddad* (C.A. 9, 1977) 558 F.2d 968, 972–974 (holding that § 922(h) neither violates the Commerce Clause nor is unconstitutionally vague); *United States v. Turcotte* (C.A. 8, 1977) 558 F.2d 893, 895 (holding that § 922(h) does not violate the Second Amendment right to bear arms), Annot., 37 A.L.R. Fed. 696, 714–716 (1978); *United States v. Craven* (C.A. 6, 1973) 478 F.2d 1329, 1338–1340, *cert. denied*, 414 U.S. 866, 94 S.Ct. 54, 38 L.Ed.2d 85 (1973), *reh. denied*, 414 U.S. 1086, 94 S.Ct. 606, 38 L.Ed.2d 491 (1973) (holding, *inter alia*, that the classification contained in the statute [i. e., § 922(h)(1)] prohibiting a person under indictment from receiving a firearm shipped in interstate commerce is not irrational and unjustified and does not deprive the defendant of due process of law under the Fifth Amendment. In that case the Sixth Circuit, on the equal protection issue, concluded that receiving firearms shipped in interstate commerce was not a fundamental right. In reference to the rational basis standard, Judge Miller, writing for the court, stated:

The Congressional findings and declaration of purpose of Title IV of the Omnibus Crime Control and Safe Streets Act of 1968 and the legislative history of this title amply demonstrate the nexus between violent criminal activity and the use of firearms. It was eminently reasonable for Congress to conclude that the indictment of an individual for a crime punishable by imprisonment for a term exceeding one year is so often indicative of a propensity for violence that the indictment classification of 18 USC § 922(h)(1) was justified in the public interest. 478 F.2d at 1339.);

*United States v. Panetta* (E.D.Pa.1977) 436 F.Supp. 114 (holding that § 922(h) is not beyond Congress' power under the Commerce Clause); *United States v. Ziegenhagen* (E.D.Wis.1976) 420 F.Supp. 72, 74–75 (holding without merit the identical argument made in this case, i. e., that the prohibition against receiving firearms transported in interstate commerce, but not firearms shipped in intrastate commerce, violated the defendant's equal protection of the law). Cf. *United States v. Burton* (C.A.8, 1973) 475 F.2d 469, 471, *cert. denied*, 414 U.S. 835, 94 S.Ct. 178, 38 L.Ed.2d 70 (1973) (holding that related § 1202(a)(1) does not violate equal protection of the law); *Cody v. United States* (C.A.8, 1972) 460 F.2d 34, 36, *cert. denied*, 409 U.S. 1010, 93 S.Ct. 454, 34 L.Ed.2d 303 (1972) (holding that § 922(a)(6) does not contravene the Commerce Clause, the Second Amendment right to bear arms, or equal protection of the law; nor is it invalid as a bill of attainder or as an *ex post facto* law); *United States v. Trioli* (D.Mass. 1970) 308 F.Supp. 358, 361 (holding that § 922(a)(6) is a valid exercise of Congress' power under the Commerce Clause).

On the basis of the foregoing authorities it is held that § 922(h) does not violate the defendant's right to due process of law or the inherent right to equal protection of the law.

## II. *The Sufficiency of the Evidence Issue*

██ The defendant claims that, under § 922(h), it is mandatory that the prosecution both positively identify the firearm exhibit as being the rifle in the possession of the defendant and show that the specific firearm had been shipped in interstate commerce. This is an argument that the evidence is not sufficient to support the verdict of the jury; and that as a matter of law the evidence does not support the conviction of the defendant.

The proper standard of appellate review in the Eighth Circuit has recently been restated in *Durns v. United States* (C.A.8, 1977) 562 F.2d 542, 545–546, *cert. denied,* 434 U.S. 959, 98 S.Ct. 490, 54 L.Ed.2d 319 (1977):

> On appellate review of the sufficiency of the evidence, the court must view the evidence in the light most favorable to the verdict rendered. *Glasser v. United States,* 315 U.S. 60, 80, 62 S.Ct. 457, 86 L.Ed. 680 (1942). It must accept as established any and all reasonable inferences from the evidence that tend to support the jury's verdict. *United States v. Overshon,* 494 F.2d 894, 896 (8th Cir.), *cert. denied,* 419 U.S. 853, 878, 95 S.Ct. 96, 42 L.Ed.2d 85 (1974). The evidence need not "exclude every reasonable hypothesis except that of guilt [; it is enough] that it be sufficient to convince the jury beyond a reasonable doubt that the defendant is guilty." *United States v. Shahane,* 517 F.2d 1173, 1177 (8th Cir.), *cert. denied,* 423 U.S. 893, 96 S.Ct. 191, 46 L.Ed.2d 124 (1975). Furthermore, because circumstantial evidence is intrinsically as probative as direct evidence, *Holland v. United States,* 348 U.S. 121, 140, 75 S.Ct. 127, 99 L.Ed. 150 (1954), the same standard applies where a conviction rests entirely on circumstantial evidence. *United States v. Carlson,* 547 F.2d 1346, 1360 (8th Cir. 1976).

On this point the defendant places primary reliance on *Walker v. United States* (C.A.8, 1974) 490 F.2d 683, in which a conviction based on armed bank robbery, a violation of § 2113(d), Title 18, U.S.C. was reversed and remanded for a new trial because the trial court erred in admitting into evidence a weapon.

At the trial, the Government elicited testimony regarding this pistol from the branch manager and the teller who were involved in the robbery. Both specifically stated that the pistol shown to them in court—the one seized from the defendant's person—was definitely not the weapon used in the robbery . . .

Despite this testimony and defense counsel's repeated objections, motions to exclude, and motions for mistrial, the trial court nevertheless admitted the pistol into evidence following the testimony of the police officer who seized the weapon from the defendant. [On cross-examination, the police officer himself admitted that he found no weapon identifiable as having been used in the robbery . . . *Walker v. United States, supra,* l. c. 684 n. 1.] We hold that this was prejudicial error.

*This is not at all the classic case of admitting into evidence a "similar" weapon which was found in the possession of a defendant but which could not be positively identified as that used in a crime. Such evidence has been regularly admitted as relevant.* [Emphasis added.] *E. g., Banning v. United States,* 130 F.2d 330, 335 (6th Cir. 1942); *United States v. Cunningham,* 423 F.2d 1269, 1276 (4th Cir. 1970). Here there was positive evidence that the pistol admitted was *not* similar to the one used in the crime. Thus the traditional justification for the admission of such a weapon is cut away and the evidence must be seen as irrelevant since it was not probative of the proposition that the accused committed the crime charged. *Walker v. United States, supra,* l. c. 684.

The defendant's reliance on *Walker* is clearly misplaced, and his argument that the evidence was not sufficient to support the verdict is without merit. In this case there was evidence that there were no firearms other than Government's Exhibit 3 in the station wagon of Jean Wynde on June

2, 1977 (R. 144–145, 166); that the rifle, Government's Exhibit 3, previously moved in interstate commerce (Government's Exhibits 2 & 3; R. 7–11); that Winchester does not have a firearms manufacturing plant in South Dakota (R. 112); that the serial number of the rifle, Government's Exhibit 3, was unique among Winchester firearms (R. 112); testimony that Government's Exhibit 3 resembled the firearm in question, by witnesses Earl Evans, Hopkins, and Nelson (R. 14–15, 33, 92); that the custody of the rifle, Government's Exhibit 3, was traced from the defendant to the defendant's nephew, Nelson, and subsequently to Tribal Officer DeCoteau (R. 30, 33, 91–92, 94); and that the empty cartridge cases in the station wagon of Jean Wynde were fired by Government's Exhibit 3 (R. 98–99, 109, 111). The only inconsistency in the Government's case was the testimony of Fayant that the rifle he saw had scrollwork on it and did not look like the rifle the defendant possessed. This discrepancy does not as a matter of law entitle the defendant to a reversal of his conviction. The discrepancy was resolved by the jury, from more than ample evidence to support its finding, in favor of the prosecution.

III. *The Contention That the Defendant Must Have Received the Firearm Prior to Any Intervening Intrastate Movement Issue*

■ The defendant claims that the holding of the Supreme Court of the United States in *Barrett v. United States*, 423 U.S. 212, 96 S.Ct. 498, 46 L.Ed.2d 450 (1976), does not control in the factual circumstances of this case. He contends that the Government is required to prove that the defendant received the firearm prior to any intervening intrastate movement of it.

In *Barrett*, the petitioner was convicted of a violation of § 922(h). The Supreme Court granted certiorari because of the apparent conflict between the Courts of Appeals of the Sixth and Eighth Circuits con-

cerning the requirements of § 922(h). *United States v. Barrett* (C.A. 6, 1974) 504 F.2d 629, *aff'd*, 423 U.S. 212, 96 S.Ct. 498, 46 L.Ed.2d 450 (1976); *United States v. Ruffin* (C.A. 8, 1974) 490 F.2d 557. The question for decision by the Supreme Court was "whether § 922(h) has application to a purchaser's intrastate acquisition of a firearm that previously, but independently of the purchaser's receipt, had been transported in interstate commerce from the manufacturer to a distributor and then from the distributor to the dealer." 423 U.S. 1. c. 213, 96 S.Ct. 1. c. 499, 46 L.Ed.2d 1. c. 453. The Supreme Court held in the affirmative.[11] Mr. Justice Blackmun, writing the majority opinion, clearly expresses the Court's broad construction of § 922(h) and the Congressional purpose in enacting the statute as follows:

A. Section 922(h) pointedly and simply provides that it is unlawful for four categories of persons, including a convicted felon, "to receive any firearm or ammunition which has been shipped or transported in interstate or foreign commerce." The quoted language is without ambiguity. It is directed unrestrictedly at the felon's receipt of any firearm that "has been" shipped in interstate commerce. 423 U.S. 1. c. 216, 96 S.Ct. 1. c. 501, 46 L.Ed.2d 1. c. 454.

B. The very structure of the Gun Control Act demonstrates that Congress did not intend merely to restrict interstate sales but sought broadly to keep firearms away from the persons Congress classified as potentially irresponsible and dangerous. These persons are comprehensively barred by the Act from acquiring firearms by any means. 423 U.S. 1. c. 218, 96 S.Ct. 1. c. 502, 46 L.Ed.2d 1. c. 455.

In *United States v. Haddad* (C.A.9, 1977) 558 F.2d 968, the United States Court of Appeals for the Ninth Circuit passed on a contention similar, if not identical, to that of the defendant. The appellant in *Haddad* alleged that *Barrett*, which involved a pur-

11. Justice White concurring, Justices Stewart and Rehnquist dissenting, and Justice Stevens not participating in the decision.

chase from a retailer who engaged in interstate commerce, was inapplicable to the purchase of a firearm by one private party from a second private party, when the latter did not engage in interstate commerce.[12] The Court of Appeals for the Ninth Circuit found that "*Barrett* may not be read so narrowly," 558 F.2d l. c. 972, and affirmed the conviction. Judge Sneed, writing the unanimous opinion of the court, based the decision of the Ninth Circuit on three grounds found in *Barrett*:

> The Court cited three reasons for its holding, all of which apply with equal force to the facts before us. First, the statutory language "is without ambiguity." *Id.* 423 U.S. at 216, 96 S.Ct. 498, 501. This language places within the reach of the statute the receipt of any firearm which "has been shipped or transported in interstate or foreign commerce." There is no reason to limit this language to direct interstate receipt or receipt from one who deals in interstate firearm transactions. Second, the Court noted that the structure of the Gun Control Act of 1968, of which section 922(h) is a part indicates an intent not merely to prohibit certain interstate transactions in firearms, but to remove firearms from the hands of persons Congress felt were dangerous, to wit, felons. The Court listed as its third reason the legislative history of the Gun Control Act and of Title IV of the Omnibus Crime Control and Safe Streets Act of 1968, which the Gun Control Act amended. This legislative history also supports the interpretation of the Congressional intent derived from the structure of the Act. The proximity of the felons (sic) receipt of the firearm to interstate commerce has little relationship to the accomplishment of the statutory goal. Appellant's receipt of the pistol clearly falls within the intended reach

of section 922(h). [Citation omitted.] 558 F.2d l. c. 972.

The defendant, in his brief, fails to cite any language in *Barrett* or a single post-*Barrett* decision in support of his claim. The defendant's attempt to distinguish the facts in this case from those in *Barrett* is unpersuasive and without merit.

We adopt the conclusion, restricted to this issue, of the United States Court of Appeals for the Ninth Circuit in *United States v. Haddad, supra,* (C.A.9, 1977) 558 F.2d 968, and hold that the Government is not required under § 922(h) to prove that the defendant received the firearm prior to any intervening intrastate movement of it.[13]

## IV. *The Denial of Defendant's Proposed Instruction Issue*

The defendant claims that the trial court erred in not giving his proposed instruction defining "receipt" of a firearm under § 922(h). The proposed instruction of the defendant is a restatement of his argument on Issue III, *supra,* specifically, that the Government must prove that the defendant received the firearm prior to any intervening intrastate movement of it. This issue is resolved against the defendant by *Barrett v. United States, supra,* 423 U.S. 212, 96 S.Ct. 498, 46 L.Ed.2d 450 (1976), *United States v. Haddad, supra,* (C.A.9, 1977) 558 F.2d 968, and our decision on Issue III, *supra.*

## V. *The Trial Court's Denial of Defendant's Motions for a Judgment of Acquittal and, in the Alternative, for a New Trial Issue*

The defendant claims that the Government failed to meet its burden of proof because of alleged inconsistencies in affida-

---

12. It should be noted that the appellant in *Haddad* received the firearm five years after the weapon had moved in interstate commerce, whereas in the instant case approximately six months had elapsed from the time of interstate movement to the defendant's receipt of the firearm.

13. The holding of this court in *United States v. Ruffin* (C.A. 8, 1974) 490 F.2d 557, 560, ". . . that it is not sufficient under § 922(h) for the government to prove that the firearm had at some remote time previously traveled in interstate commerce," is no longer viable under *Barrett v. United States,* 423 U.S. 212, 96 S.Ct. 498, 46 L.Ed.2d 450 (1976).

vits subsequently taken of two of the Government's witnesses, Hopkins and Fayant. Therefore, the defendant argues that he is entitled, as a matter of law, to a judgment of acquittal. The applicable standard of review has been restated in *United States v. Frye* (C.A.8, 1977) 548 F.2d 765, 767–768, as follows:

> In considering a motion for acquittal, the verdict of guilty must be sustained if, viewing the evidence in the light most favorable to the government together with all reasonable inferences therefrom, there is substantial evidence to support it. [Citation omitted.]

This standard and our decision on Issue II, *supra*, requires rejection of the defendant's contention. *See also United States v. Frazier* (C.A.8, 1977) 545 F.2d 71, 74, *cert. denied*, 429 U.S. 1078, 97 S.Ct. 823, 50 L.Ed.2d 798 (1977), *reh. denied*, 431 U.S. 926, 97 S.Ct. 2204, 53 L.Ed.2d 241 (1977).

■ The defendant submits, in the alternative, that he has properly established grounds for a new trial pursuant to *United States v. Frye, supra*, l. c. 769:

> Before a new trial on the ground of newly discovered evidence can be granted, each of the five conditions must be met:
>
> (a) The evidence must be in fact, newly discovered, i. e., discovered since the trial; (b) facts must be alleged from which the court may infer diligence on the part of the movant; (c) the evi-

dence relied on, must not be merely cumulative or impeaching; (d) it must be material to the issues involved; and (e) it must be such, and of such nature, as that, on a new trial, the newly discovered evidence would probably produce an acquittal. [Citations omitted.]

*See also United States v. Easter* (C.A.8, 1977) 552 F.2d 230, 235, *cert. denied*, 434 U.S. 844, 98 S.Ct. 145, 54 L.Ed.2d 109 (1977); *United States v. Carter* (C.A.8, 1977) 549 F.2d 1164, *cert. denied, Carter v. United States*, 430 U.S. 974, 97 S.Ct. 1665, 52 L.Ed.2d 369 (1977). The grant or denial of a motion for a new trial is within the discretion of the trial court and will not be upset on appeal unless there has been an abuse of that discretion. *United States v. Easter, supra*, l. c. 235; *United States v. Carter, supra*, l. c. 1165.

■ This issue does not merit an extended, elaborate discussion of the facts. We are in complete agreement with the finding of Judge Nichol that the defendant failed to satisfy requirements (c), (d), and (e) of *United States v. Frye, supra*, (C.A.8, 1977) 548 F.2d 765, 769. Further, we find that Judge Nichol did not abuse his broad discretion in denying the defendant's motion for a new trial. We also conclude that, even if the affidavits taken of Hopkins and Fayant were construed to constitute recanted testimony (a belief we do not share, given the circumstances under which the affidavits for the defense were taken),[14] the defend-

---

14. For example, in his post-trial affidavit taken on behalf of the Government, Fayant describes the circumstances under which he signed the post-trial affidavit taken on behalf of the defendant:

(Reading) I have been shown a copy of an affidavit which I later signed in regard to this case. Fern Eastman [Fern Mathias] came to my house about a week or so before Teddy's [the defendant] sentencing and showed me a copy of Agent Mogen's FD 302. She asked me if that was the truth. I told her yes except for the part about my wife being involved in seeing Teddy Wynde. Other—and then there's a misspelling—other than that I told her it was the truth. She said that Teddy was going to appeal and that my statements in Court had been damaging. I told

her I told the truth in Court and the truth in the statements to Mogen and Trottier.

A couple days later, Fern came back with the affidavit all typed up. There were several other people in her van—mixed up color—blue and other color blend (sic) in. She never got out of the van but said she had an affidavit for me to sign but it would have to be notarized. My wife came out and both went in with her to the State Bank of Waubay, South Dakota. While there I read the affidavit. It was accurate except for that one statement toward the end that "I am certain that the two rifles are not one and the same." I told Fern this was not right. I was just not sure whether the two rifles were the same. I had seen the rifle on Teddy's lap while he sat in his car. The barrel was pointed toward the driver's door at the time I was talking to

ant would nevertheless fail to meet the requirements for a new trial as stated in *Mastrian v. McManus* (C.A.8, 1977) 554 F.2d 813, 822–823, *cert. denied*, 433 U.S. 913, 97 S.Ct. 2985, 53 L.Ed.2d 1099 (1977):

> In federal court, the impact of recanted testimony as a basis for a new trial motion depends both on the credibility of the recanting witness and the materiality of his testimony. Unless the recanted testimony would probably produce an acquittal on retrial, a new trial motion on this ground must be denied. [Citations omitted.]

On this subject, Judge Nichol made the following telling statement during the December 2, 1977, hearings:

> . . . I feel that the affidavits that have been submitted by the FBI in this particular instance, and I'm taking into consideration the examination of . . Fern Mathias, . . . which was certainly uncertain at most (sic), . . . [are] certainly far more credible than the testimony as shown in the affidavits submitted on the November 2nd hearing (PT. 124).

This finding of fact was not clearly erroneous, to say the least. The motions for a judgment of acquittal and, in the alternative, for a new trial were properly denied in accordance with the criteria set forth in *United States v. Frye, supra*, (C.A.8, 1977) 548 F.2d 765, and *Mastrian v. McManus, supra*, (C.A.8, 1977) 554 F.2d 813. The denial of each of these motions was based on appropriate legal standards and reliable findings of fact by the District Court.

The judgment of the District Court is, on all issues, affirmed.

### Conclusion

For the reasons stated above, the judgment of the United States District Court for the District of South Dakota is hereby

AFFIRMED.

---

him. To me all Winchesters look alike. I am not sure whether it had any engraving on it or not.

Fern made no comment when I told her the affidavit was not right. I just went ahead and signed it. I signed it because Teddy was

---

appealing. I just signed it because it was there. Fern did not force me to sign it but I definitely told her that that one word "certain" was not accurate. I haven't heard from Fern since then. (PT. 32–34).