UNITED STATES of America, Plaintiff–Appellee,

v.

Jose AMADOR–GALVAN, aka Jose Amador Pullido–Villarreal, Defendant–Appellant.

UNITED STATES of America, Plaintiff–Appellee,

v.

Rodolfo MOLINA, Jr., Defendant–Appellant.

Nos. 92–10325, 92–10715.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Oct. 7, 1993.

Decided Nov. 22, 1993.

---

Brian I. Rademacher, Sherick Law Office, Tucson, AZ, for defendant-appellant Amador–Galvan.

John G. Bogart, Tucson, AZ, for defendant-appellant Molina.

William Randolph Stevens, II, Asst. U.S. Atty., Tucson, AZ, for plaintiff-appellee.

Before: FERGUSON, THOMPSON, and O'SCANNLAIN, Circuit Judges.

FERGUSON, Circuit Judge:

Jose Amador–Galvan and Rodolfo Molina were convicted of conspiracy to possess with intent to distribute over five kilograms of cocaine in violation of 21 U.S.C. § 846, and possession with intent to distribute 5 kilograms or more of cocaine in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(A)(ii)(II).

This opinion addresses the district court's refusal to disclose the identities of non-witness confidential informants and exclusion of expert witness testimony on the unreliability of eyewitness testimony. We address all other issues in a separate memorandum disposition.

## FACTUAL AND PROCEDURAL BACKGROUND

On April 27, 1988, at around 11:00 a.m., Customs Inspector Rodolfo Molina, Jr. let a Ford LTD containing 661 pounds of cocaine pass through a primary inspection lane at the United States–Mexico border checkpoint at

the Douglas, Arizona Port of Entry. In two formal statements given later to his employers, Molina described the driver of this car as a "gringo" about 25 years old, very light complected, who claimed to be a United States citizen and spoke perfect English with no trace of a Spanish accent, and whom Molina recognized from previous border crossings.

Customs Inspector George Campos, working in the secondary inspection area, stopped the car after it passed through the primary inspection area to question the driver and inspect the car because the driver and car fit a "profile." Campos asked the driver to step out of the car and asked for his passport. The driver reached for his back pocket, pulled out a wallet, then threw it on the ground and ran back to Mexico. Agents discovered 661 pounds of cocaine in the vehicle's trunk. In contrast to Molina's description, Campos described the driver as an adult Spanish-speaking Hispanic male he had never seen before, around 25–28 years old, with a light complexion. Campos told investigating agents that he felt certain he would be able to identify this person if he saw him again.

The United States Customs Service began an investigation to identify the driver, focusing in part on Customs Inspector Molina. The Customs Service began to suspect that Molina was involved in the cocaine smuggling scheme because, *inter alia*, he allowed the "profile" driver to pass through his lane without inspection, he allegedly did not enter the car's license plate number into the TEC computer system as he should have, he did not run after the fleeing driver as the other customs inspectors did, and he gave a different description of the driver than did some of his colleagues. Furthermore, the Customs Service was aware that he was involved in suspicious activity a few months earlier, on January 21 and 22, 1988, with two suspected cocaine traffickers and money launderers. Customs Inspector Campos testified, however, that he personally did not suspect Molina was involved.

On May 9, 1988, Customs Special Senior Agent Michael Woodworth obtained a warrant to search Molina's residence for evidence of his involvement in the cocaine smuggling attempt. The search warrant, executed the next day, turned up address books linking Molina to Amador–Galvan. On the basis of this evidence, subpoenaed telephone records showing telephone contact between Molina and Amador–Galvan, a tip from an informant, a latent fingerprint taken from the inside rear view mirror of the Ford LTD, and a photo identification by Campos, the Customs Service determined that Amador–Galvan could have been the driver of the Ford LTD.

Approximately 28 months later, on August 22, 1990, Customs Inspector Campos identified Amador–Galvan as the driver of the Ford LTD in an informal photographic lineup. Customs Agent Morgan sent Campos to Amador–Galvan's office in Agua Prieta, Mexico, to make an appointment with a dentist who Morgan told Campos might be the driver of the Ford LTD. Instead of having Campos meet the dentist to conduct a one-person showup, Morgan took 21 photographs of four men in front of the dentist's office. From these photographs, Campos recognized two of the men because they frequently crossed the border. Campos did not recognize the third man, whose physical appearance apparently differed greatly from the description of the driver of the Ford LTD. Campos identified the fourth man, Amador–Galvan, as the driver of the Ford LTD.

Amador–Galvan and Molina were indicted together on April 24, 1991, and were both convicted on February 4, 1992 at a joint trial, for conspiracy to distribute more than 5 kilograms of cocaine, in violation of 21 U.S.C. § 841(a)(1), 21 U.S.C. § 841(b)(1)(A)(ii)(II) and 21 U.S.C. § 846 (Count I); and possession with intent to distribute more than 5 kilograms of cocaine, in violation of 21 U.S.C. § 841(a)(1) and § 841(b)(1)(A)(ii)(II) (Count II). Both Amador–Galvan, sentenced to 188 months imprisonment, and Molina, sentenced to 327 months imprisonment, are currently serving their terms.

## DISCUSSION

### 1. Motion to Disclose Informants' Identities

Amador–Galvan and Molina contend that the district court erred in denying their mo-

tion to disclose the identities of four non-witness government informants who allegedly could have provided exculpatory evidence. We conclude the district court abused its discretion in failing to hold an *in camera* hearing to determine whether the informants in fact had information that would have been relevant and helpful to the defendants.

■ The government has a qualified privilege to withhold from disclosure the identity of persons who furnish information of violations of law to officers charged with enforcement of that law. *Roviaro v. United States,* 353 U.S. 53, 59, 77 S.Ct. 623, 627, 1 L.Ed.2d 639 (1957). "The purpose of the privilege is the furtherance and protection of the public interest in effective law enforcement," by preserving the anonymity of these informants. *Id.* A trial court may require disclosure, however, where the defendant shows that disclosure of an informant's identity, or of the contents of his communication, is "relevant and helpful to the defense of the accused, or is essential to a fair determination of a cause." *Id.* at 60–61, 77 S.Ct. at 627–628.

■ The defendant bears the burden of demonstrating a need for disclosure of a confidential informant's identity. He must show that he has more than a "mere suspicion" that the informant has information which will prove "relevant and helpful" or will be essential to a fair trial. *United States v. Williams,* 898 F.2d 1400, 1402 (9th Cir. 1990).

■ The district court must then apply a balancing test, weighing the public interest in encouraging citizens to inform the government about criminal activity, against an accused's right to prepare his defense. *Roviaro,* 353 U.S. at 62, 77 S.Ct. at 628; *United States v. Sanchez,* 908 F.2d 1443, 1451 (9th Cir.1990). "Whether a proper balance renders nondisclosure erroneous must depend on the particular circumstances of each case, taking into consideration the crime charged, the possible defenses, the possible significance of the informer's testimony, and other relevant factors." *Roviaro,* 353 U.S. at 62, 77 S.Ct. at 628.

■ The district court, in exercising its discretion on whether to conduct an *in camera* hearing on the defendant's need for a confidential informant's identity or testimony, must hold such a hearing where the defendant has shown that the information would be "relevant and helpful." *See, e.g., United States v. Jaramillo–Suarez,* 950 F.2d 1378, 1386–87 (9th Cir.1991).

■ Although Amador–Galvan and Molina showed the potential relevance and helpfulness to their defense of discovering the identity of the confidential informants, the district court denied the request on the ground that the defendants did not have any evidence independent of the informants themselves to support the claim that the driver was not Amador–Galvan. Given that the Government's theory of prosecution hinges on the assumption that Amador–Galvan was the driver of the car in question, one or more of these four informants could have provided evidence weakening the Government's case. For example, if they were percipient witnesses, these informants could provide eyewitness testimony; if not, they might still be able to provide information which might lead to a firsthand source or circumstantial evidence. Any such evidence would clearly be "relevant and helpful" to preparing Amador–Galvan's defense.

Because Amador–Galvan and Molina have made a threshold showing of need, the district court should have granted an *in camera* hearing to determine whether in fact any of these informants would be helpful to the defendant, and to aid in its application of the *Roviaro* balancing test. We remand so that the district court can hold such a hearing.

### 2. Motion to Admit Expert Testimony on Unreliability of Eyewitness Testimony

■ Defendants also contend that the district court erred in denying their motion to admit expert witness testimony concerning the unreliability of eyewitness testimony. We review the district court's decision for abuse of discretion. *United States v. Poole,* 794 F.2d 462, 468 (9th Cir.1986) (*amended on other grounds,* 806 F.2d 853 (9th Cir.1986)).

The United States Supreme Court has recently addressed the issue of what standard a district court should apply in admitting expert testimony. *Daubert v. Merrell Dow*

*Pharmaceuticals,* — U.S. ——, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993).

■ The Court has explicitly rejected the requirement set out in *Frye v. United States,* 54 App.D.C. 46, 293 F. 1013, 1014 (1923), and applied in *United States v. Amaral,* 488 F.2d 1148 (9th Cir.1973), that expert testimony based on scientific theory must be "generally accepted" as reliable in the relevant scientific community. *Daubert,* — U.S. at ——, 113 S.Ct. at 2794 ("*Frye* made 'general acceptance' the exclusive test for admitting expert scientific testimony. That austere standard, absent from and incompatible with the Federal Rules of Evidence, should not be applied in federal trials.").

Thus, "[i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise." Fed. R.Evid. 702.

Under this rule, a district judge "must determine at the outset, pursuant to Rule 104(a), whether the expert is proposing to testify to (1) scientific knowledge that (2) will assist the trier of fact to understand or determine a fact in issue." *Daubert,* — U.S. at ——, 113 S.Ct. at 2796. The judge must assess "whether the reasoning or methodology underlying the testimony is scientifically valid and ... whether that reasoning or methodology properly can be applied to the facts in issue." *Id.* While the district judge should remain concerned about the relevance and reliability of such scientific evidence, his or her determination must be based on an individualized inquiry, rather than the application of the rigid *Frye/Amaral* test.

Under the *Daubert* rule, the district court should decide whether such testimony is relevant, and if so, whether the theory propounded is trustworthy and scientifically valid. Testimony attacking the reliability of eyewitness testimony is clearly relevant to Ama-

dor–Galvan's defense; it is his main line of defense. Less clear is whether the theories on eyewitness identification are "scientifically valid," helpful, and of sufficient "evidentiary reliability" and trustworthiness. *Daubert,* — U.S. at ——, 113 S.Ct. at 2795–96.

The district court did not consider whether Amador–Galvan's proffered expert testimony met *Daubert*'s requirements. Thus, we remand to the district court for it to consider whether, under *Daubert,* the testimony should have been admitted.

## CONCLUSION

The district court's rulings on the informants and unreliability of eyewitness testimony are REVERSED and REMANDED to the district court for further proceedings. In the event the district court decides that disclosure of the informants' identities or admission of the expert testimony was necessary at trial, not only Amador–Galvan, but Molina as well, must be granted a new trial. Molina's conspiracy conviction depends upon Amador–Galvan's identity as the driver of the Ford LTD.