UNITED STATES of America,
Plaintiff–Appellee,

v.

Darren Eugene HENDERSON,
Defendant–Appellant.

No. 99–10526.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Aug. 8, 2000

Filed Dec. 11, 2000

As Amended March 5, 2001.

---

His arrest followed a tip by a confidential informant who told the Federal Bureau of Investigation ("FBI") that Henderson was the bank robber depicted on a television episode of "America's Most Wanted." Henderson challenges the district court's refusal to order disclosure of the informant's name and to hold an in camera hearing on his disclosure request. Henderson also argues that probable cause for his arrest was lacking and that FBI agents improperly impounded and searched his rental car, on which the lease had expired. He also contends the district court erred by denying his request to present an alibi witness, by allowing a witness to testify that he was the bank robber shown in bank surveillance photographs, by denying his motion for acquittal on two counts of bank robbery based on robberies that occurred on the same day, and by denying his new trial motion brought on the ground of prosecutorial misconduct during closing argument.

We have jurisdiction under 28 U.S.C. § 1291 (1994), and we affirm.

Thomas C. Naylor, Henderson, Nevada, for the defendant–appellant.

Walter L. Ayers, Asst. U.S. Atty., Las Vegas, Nevada, for the plaintiff–appellee.

Before: THOMPSON, T.G. NELSON, and SILVERMAN, Circuit Judges.

DAVID R. THOMPSON, Circuit Judge:

Darren Eugene Henderson was convicted of three counts of armed bank robbery in violation of 18 U.S.C. § 2113(a) and (d) (1994). He contended someone else committed the robberies. He had been an informant who had provided information leading to the apprehension of a number of criminals, and he claimed he had been framed in retaliation for these services.

## FACTS

"America's Most Wanted" is a nationally syndicated television show that profiles unsolved crimes and solicits assistance from the public in identifying and tracking down the suspects portrayed on its episodes. The March 21, 1998 episode featured a suspect sought in a series of bank robberies in New Orleans, Louisiana. The show explained that the robber employed a series of disguises designed to hide his appearance. One particularly notorious disguise, which involved a black wig, earned the robber the nickname "the Wig Bandit."

Agents of the FBI believed the Wig Bandit was also responsible for three bank robberies in Las Vegas, Nevada. On January 16, 1998, a lone black man wearing a maroon suit had robbed the Bank of America at 4610 West Sahara in Las Vegas. After entering the bank, the man, who was wearing glasses, brandished a black hand-

gun and, using obscene language, demanded fifty and one hundred dollar bills from two tellers. After they complied, he left. On March 13, 1998, agents believed the same man, this time wearing glasses, camouflage fatigues and a matching hat, robbed the Wells Fargo Bank at 4720 South Eastern Avenue in Las Vegas. He again pointed a handgun at a teller and, cursing, demanded that the teller give him money. When he received the money, he left. That same day, surveillance cameras filmed what appeared to be the same man rob the Bank of America on 1380 East Flamingo in Las Vegas. Once again, the man, who was wearing glasses and camouflage clothing, displayed a handgun and ordered a bank teller to give him fifty and one hundred dollar bills. After the teller gave the man the money, he left the bank. Agents believed the New Orleans bank robberies and the three Las Vegas bank robberies were the work of the same individual because the crimes followed the same organizational pattern and because the robber in New Orleans had worn the same distinctive maroon suit worn by the robber in the January 16, 1998 Las Vegas bank robbery.

Given this connection between the Las Vegas and New Orleans robberies, when a man called the FBI field office in New Orleans and told agents that he recognized the bank robber portrayed on the March 21st "America's Most Wanted" episode, they contacted FBI Special Agent Tracy L. Dockery of the Las Vegas FBI office. Agent Dockery interviewed the tipster, who said that the suspect was a man named "Dee Henderson." The tipster also positively identified the suspect in the Las Vegas surveillance photographs as "Dee Henderson." He added that "Dee Henderson" was from New Orleans, had an extensive criminal record, and liked to stay at one of three hotels while in Las Vegas, including the Las Vegas Marriott Hotel.

Agent Dockery then searched through the FBI's computerized databases to find an individual with connections to both Las Vegas and New Orleans. She determined that the appellant, Henderson, had such connections. She found a Las Vegas driver's license for Henderson that fit the informant's description of "Dee Henderson." She learned that Henderson had used, in various documents, certain addresses in Las Vegas and New Orleans that were close to several of the banks victimized by the Wig Bandit. She also learned that an electronic tracking device, or B-pack, associated with one of the Las Vegas robberies had been found near an address listed by Henderson on his Nevada driver's licence. Finally, because the tipster told the FBI that "Dee Henderson" was currently staying at the Marriott Hotel in Las Vegas, agents called the front desk at that hotel and learned that Henderson was staying in ·one of the guest rooms with a girlfriend, Anne Thompson. The . agents then checked themselves into the hotel and began surveillance of Henderson.

On the morning of March 24, 1998, Allison Ryan of the FBI called the Las Vegas Metropolitan Police Department ("LVMPD") and asked for a booking photo of Henderson, which the LVMPD had from a previous arrest. Agent Dockery and Special Agents Henry Schlumpf and Deborah Calhoun testified that when they obtained the booking photo they compared it with the surveillance photos of the New Orleans and Las Vegas bank robberies. All three agents agreed that Henderson was the man shown in the surveillance photographs. Later that day, when they saw Henderson in person, they said they became even more convinced that he was the robber depicted in the surveillance photographs from the Las Vegas bank robberies.

That afternoon, agents observed Henderson's girlfriend, Thompson, outside the Marriott Hotel loading a rental car with luggage. Later, Henderson left the hotel and entered the car to join Thompson. The agents then ·arrested him. The FBI also took Thompson into custody be-

cause there was an outstanding warrant for her arrest on an unrelated matter.

While the agents attempted to determine whether the outstanding warrant for Thompson's arrest was valid, they allowed her to remove some of her belongings from the rental car, which they had impounded. Thompson refused to consent to a search of the car because, she said, she had marijuana in the trunk. She previously had told the agents there was a gun in the trunk.

The FBI later learned the warrant for Thompson's arrest was invalid and decided to release her. Thompson asked to remove more of her personal belongings from the impounded rental car. Agent Friedrich told her she could remove those items, but that an agent would have to watch her because the FBI was probably going to obtain a search warrant for the vehicle, given the information that the car contained a gun and marijuana. Thompson agreed to this procedure, and while Agent Friedrich watched, she rummaged through her belongings in the trunk of the car. While she was doing so, Agent Friedrich observed several pieces of clothing in the trunk that were similar to items worn by the bank robber, including a burgundy suit, a Kangol hat, and military boots. Based on Agent Friedrich's observations, the FBI obtained a search warrant for the car. When the agents searched the car, they recovered the burgundy suit, one black and one silver handgun, several Kangol hats, military boots, and a black bag similar to one used by the suspect in several of the robberies.

On April 8, 1998, a grand jury indicted Henderson on three counts of bank robbery for robbing the three banks in Las Vegas. Before trial, Henderson moved to compel disclosure of the tipster's identity. The district court declined to hold an in camera hearing and denied the disclosure motion. Henderson also moved to exclude the clothes and firearms found in the trunk of his rental car. The district court concluded Henderson had standing to make such a challenge, but denied the motion.

At trial, the government called two Bank of America employees, Rosalind Terlitzky and Michelle Sanders, who testified that they could not say whether Henderson was the man who robbed their bank on West Sahara on January 16, 1998. Later, over Henderson's objection, the government called LVMPD Detective Gayland Hammack. Detective Hammack knew Henderson and, based on his review of the surveillance photographs from the January 16th bank robbery, he testified that Henderson was the man depicted in the photograph robbing that bank.

The government also called Tamika Wade, who worked at the Wells Fargo Bank on South Eastern Avenue that was robbed on March 13, 1998. Wade positively identified Henderson as the bank robber. Anje Campisi also testified for the government. Campisi, who worked as a teller at the Bank of America on East Flamingo, identified Henderson as the man who robbed that bank shortly before it closed on March 13, 1998.

Henderson testified on his own behalf. He began his testimony by recounting how he had served as a confidential informant for the LVMPD, as well as other law enforcement agencies, and had helped apprehend numerous suspects. He testified that several individuals held grudges against him because his work had led to their arrests. He added that some of these individuals had tried to kill him. Henderson denied committing the bank robberies. Instead, he said a man named Nathan Presley robbed the Bank of America on January 16th. He said that Presley wore prescription eyeglasses, like the robber, while he did not. He added Presley had access to his belongings and could have worn his burgundy suit in order to frame him for that robbery. He also testified that after the January 16th robbery, he had seen Presley carrying an usually large amount of cash.

With regard to the March 13th bank robberies, Henderson said that his cousin, Willie McGee, committed them. He testified that McGee was in Las Vegas during the time of those robberies. He said that while he and McGee shared many of the same facial features, McGee's partially closed right eye and bigger ears made him more closely resemble the robber depicted in the March 13th surveillance photographs. He said that McGee owned military style boots identical to those worn by the robber. Henderson also testified that after the March 13th robberies, McGee had an unusually large amount of money. The jury convicted Henderson of all three robberies and this appeal followed.

## ANALYSIS

### I

■ Henderson contends the district court abused its discretion when it failed to order the government to disclose the identity of the informant, and failed to hold an in camera hearing on that request. We disagree.

■ The government has a limited privilege to withhold an informant's identity. *See Roviaro v. United States,* 353 U.S. 53, 59–61, 77 S.Ct. 623, 1 L.Ed.2d 639 (1957). This privilege serves several important law enforcement objectives, including encouraging citizens to supply the government with information concerning crimes. *See id.; see also McCray v. Illinois,* 386 U.S. 300, 308–09, 87 S.Ct. 1056, 18 L.Ed.2d 62 (1967); *United States v. Vargas,* 931 F.2d 112, 115 (1st Cir.1991). To obtain disclosure, a defendant must show a need for the information, *see United States v. Spires,* 3 F.3d 1234, 1238 (9th Cir.1993) (citing *United States v. Sai Keung Wong,* 886 F.2d 252, 256 (9th Cir. 1989)), and in doing so, must show more than a "mere suspicion" that the informant has information which will prove "relevant and helpful" to his defense, or that will be essential to a fair trial. *See Amador–Galvan,* 9 F.3d at 1417; *United States v.*

*Williams,* 898 F.2d 1400, 1402 (9th Cir. 1990). Balancing the defendant's and the government's interests, a district court must hold an in camera hearing whenever the defendant makes a " 'minimal threshold showing' that disclosure would be relevant to at least one defense." *Spires,* 3 F.3d at 1238 (citing *Sai Keung Wong,* 886 F.2d at 256); *see also Amador–Galvan,* 9 F.3d 1414, 1417 (9th Cir.1993). Such an in camera hearing is advantageous because it poses "little risk of disclosing the identity of the informant" and may provide many of the same benefits as disclosure itself, especially when defense counsel may participate under an order not to reveal any information disclosed during the hearing. *Spires,* 3 F.3d at 1238.

Henderson's defense was that he was framed. He testified that he had developed numerous enemies through his work as a police informant. He said that Presley and McGee committed the robberies and used his clothes to lead the authorities to conclude that he was the perpetrator. He argues that disclosure of the informant's identity would be relevant to this defense. *See Spires,* 3 F.3d at 1239; *Amador–Galvan,* 9 F.3d at 1417.

Why Henderson's argument fails is illustrated by our *Spires* decision, in which we ordered the district court to hold an in camera hearing on the disclosure request. In *Spires,* the defendant's roommate was the suspected informant. Weapons and drugs were found by the police in the defendant's truck and bedroom. We pointed out that "Spires could argue that his roommate planted the contraband in order to set him up." *Spires,* 3 F.3d at 1239. We reasoned that disclosure of the informant's identity would be relevant to one of Spires's defenses. *Id.; see also Amador–Galvan,* 9 F.3d at 1417.

In the present case, if the informant was either Presley or McGee, or someone working with them or someone who held a grudge against Henderson, Henderson could have argued that he was set up to take the fall to conceal the identity of the

true robber or to get back at him for having helped the police in other cases. But, whereas the informant's disclosure in *Spires* would have assisted him in explaining away the presence of the weapons and drugs found in his truck and bedroom, here no matter what evil motives Henderson's informant may have had, disclosure of his identity would not have explained away the most convincing evidence of Henderson's guilt. That evidence consisted of positive identification testimony by bank employees that Henderson was the person who robbed the banks where they were employed, and positive identification testimony by Detective Hammack that Henderson was the person depicted in surveillance photographs shown robbing the third bank.

■■ In addition to the foregoing, our standard of review is of particular significance in this case. We review for abuse of discretion a district court's denial of a motion for disclosure of an informant's identity and for an in camera hearing. *United States v. Fixen*, 780 F.2d 1434, 1439 (9th Cir.1986). Under the abuse of discretion standard, unless a district court makes an error of law or rests its decision on a clearly erroneous finding of a material fact, *see United States v. Sprague*, 135 F.3d 1301, 1304 (9th Cir.1998), or rules in an irrational manner, *see In re Sternberg*, 85 F.3d 1400, 1405 (9th Cir.1996), *overruled on other grounds by In re Bammer*, 131 F.3d 788 (9th Cir.1997) (en banc), "we must accord the district court wide latitude in its decision" and may not substitute our judgment for that of the district court. *United States v. McMullen*, 98 F.3d 1155, 1159 (9th Cir.1996). Applying this deferential standard, we conclude the district court did not abuse its discretion by denying both disclosure of the informant's identity and an in camera hearing. "[Henderson] did not allege facts which would indicate that such a disclosure was 'essential to a fair determination of [his] cause,' " *Fixen*, 780 F.2d at 1440 (quoting *Roviaro*, 353 U.S. at 60–61, 77 S.Ct. 623

(1957)), or that disclosure would be relevant or helpful to his defense.

**II**

■ Henderson contends the district court should have suppressed the items found in the trunk of his rental car. We review de novo the denial of a motion to suppress. *See United States v. Kemmish*, 120 F.3d 937, 939 (9th Cir.1997); *United States v. Sherwood*, 98 F.3d 402, 409 (9th Cir.1996). Henderson argues the district court should have suppressed the evidence because (1) the agents lacked probable cause to arrest him; (2) the agents improperly impounded the car, precluding an inventory search; (3) the search following Henderson's arrest was not "incident" to his arrest; and (4) the warrant pursuant to which the items were seized should not have issued because it was itself based on an illegal search, that search being Agent Friedrich's observations made while the FBI exercised dominion and control over the car and while Thompson rummaged through the car for her belongings.

■■ The government contends we need not reach the merits of these contentions because Henderson lacks standing to challenge the search. To have standing, Henderson must have had a subjective expectation of privacy in the car, an expectation society accepts as objectively reasonable. *See Minnesota v. Olson*, 495 U.S. 91, 95–96, 110 S.Ct. 1684, 109 L.Ed.2d 85 (1990); *California v. Greenwood*, 486 U.S. 35, 39, 108 S.Ct. 1625, 100 L.Ed.2d 30 (1988); *Katz v. United States*, 389 U.S. 347, 361, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967) (Harlan, J., concurring). Henderson clearly had a reasonable expectation of privacy in the car because he was a lessee. *See United States v. Wellons*, 32 F.3d 117, 119 & n. 2 (4th Cir.1994); *compare United States v. Boruff*, 909 F.2d 111, 117 (5th Cir.1990) (holding an individual who was not listed as a driver on the rental agreement did not have a legitimate expectation of privacy despite the fact that he was in "sole possession and control of

the vehicle" at the time of the stop). The government argues, however, that *at the time of the search* Henderson did not have such a privacy interest because the rental agreement had expired.

Whether a lessee has a reasonable expectation of privacy in a rental car on which the lease has expired is an issue of first impression in this circuit. Only one court of appeals has reached this issue. The Eleventh Circuit has held that a lessee may have a reasonable expectation of privacy in a rental car even after the rental agreement has expired. *See United States v. Cooper,* 133 F.3d 1394 (11th Cir. 1998). In *Cooper,* the government argued that the defendant lacked standing to challenge the search of his rental car because his rental agreement had expired four days prior to the search. The *Cooper* court concluded, however, that the defendant "retained a sufficient amount of control and possession over the rental car for it to fall within the zone of constitutional sanctity." *Id.* at 1402. It emphasized that the defendant paid the rental on the car and the company had not attempted to repossess the car, despite its contractual right to do so. *See id.* at 1400.

We find this reasoning persuasive and, following *Cooper,* conclude Henderson has standing to challenge the search of his rental car. Like the defendant in *Cooper,* although the lease had expired, the rental car company had not attempted to repossess the car. To the contrary, a representative of the company testified that it was not unusual for customers to keep their rental cars beyond the terms of their rental agreements. He added that when that happened, the company would simply charge the customer's credit card for the late return. We conclude Henderson retained a reasonable expectation of privacy in the rental car. Even though the rental agreement had expired, the parties to the agreement understood that Henderson would retain possession and control of the car and would, in effect, continue to rent it.

This conclusion is not inconsistent with cases on which the government relies which suggest that one loses a legitimate expectation of privacy in rented property after the rental contract has expired. *See United States v. Poulsen,* 41 F.3d 1330, 1336–37 (9th Cir.1994); *United States v. Huffhines,* 967 F.2d 314, 318 (9th Cir. 1992); *United States v. Haddad,* 558 F.2d 968, 975 (9th Cir.1977). In *Huffhines* and *Haddad,* we held that the defendants lacked standing to challenge searches of their hotel rooms when their rental agreements had been terminated for cause. *See Huffhines,* 967 F.2d at 318; *Haddad,* 558 F.2d at 975. In *Poulsen,* we rejected a defendant's claim that he had standing to challenge the search of a storage locker when the lessor had terminated the lease for non-payment. In all three of these cases, the rental agreement had not only been terminated, but the lessor had reasserted control over the rental property. In *Huffhines,* the hotel's assistant manager had repossessed the room and locked the guest out. *Huffhines,* 967 F.2d at 316. In *Haddad,* the guest had been ejected from the hotel. *Haddad,* 558 F.2d at 971. In *Poulsen,* the lessor had entered the unit to remove its contents. *Poulsen,* 41 F.3d at 1332. These acts of dominion terminated the defendants' control over the property. Here, the parties continued to act as though the rental agreement had not expired. Henderson retained control over the car and the lessor continued to treat Henderson as the lessee.

As to the merits of Henderson's challenge to the search of the car, he argues that because the agents lacked probable cause to arrest him, *a fortiori,* they lacked probable cause to impound or search his vehicle. We note at the outset the fallacy of Henderson's premise by which he contends that if the officers lacked probable cause to arrest him, they lacked probable cause to seize or search his rental car.

The focus of the arrest inquiry is different from that of the search inquiry.

See *Greene v. Reeves*, 80 F.3d 1101, 1106 (6th Cir.1996). Officers have probable cause for an arrest if at the time of the arrest, "the facts and circumstances within their knowledge and of which they [have] reasonably trustworthy information [are] sufficient to warrant a prudent man in believing" that the defendant committed an offense. *Hunter v. Bryant*, 502 U.S. 224, 228, 112 S.Ct. 534, 116 L.Ed.2d 589 (1991) (citing *Beck v. Ohio*, 379 U.S. 89, 91, 85 S.Ct. 223, 13 L.Ed.2d 142 (1964)). Officers have probable cause for a search when "the known facts and circumstances are sufficient to warrant a man of reasonable prudence in the belief that contraband or evidence of a crime will be found." *Ornelas v. United States*, 517 U.S. 690, 696, 116 S.Ct. 1657, 134 L.Ed.2d 911 (1996). "[T]here may be probable cause to search without probable cause to arrest, and vice-versa." *Id.* (citing 2 Wayne R. LaFave, Search & Seizure: A Treatise on the Fourth Amendment § 3.1(b) at 9 (3d ed. 1996)); *see, e.g., State v. Kiper*, 193 Wis.2d 69, 532 N.W.2d 698 (1995). Here, as is often the case, the questions of whether the agents had probable cause to arrest Henderson and whether they could search his car rest on the same evidence. On this evidence, we conclude that the agents had probable cause to arrest Henderson and to search his car, and that the search of his car was permissible under the automobile exception to the warrant requirement. *See United States v. Ross*, 456 U.S. 798, 809, 102 S.Ct. 2157, 72 L.Ed.2d 572 (1982).

■■■ In analyzing these issues, we first address the question of probable cause for Henderson's arrest. After the tipster first identified "Dee Henderson" as the suspect in the Las Vegas bank robberies, FBI agents uncovered substantial circumstantial evidence linking Henderson to those robberies. Agents not only learned that Henderson had connections with both New Orleans and Las Vegas—the two cities that had been victimized by the Wig Bandit—they also discovered that Henderson used addresses on official documents that were near the victim banks. In addition, the agents identified one of Henderson's prior residences as being near where a B-pack from a recent Las Vegas bank robbery had been found. Most importantly, the police compared Henderson's mug shot from the LVMPD's file to the bank surveillance photographs of the robber of the Las Vegas banks and concluded, based on their own observations of this photographic evidence, that Henderson was the man shown robbing the three banks. These facts would have led a reasonably prudent person to believe Henderson was the Wig Bandit who committed the three Las Vegas bank robberies. Thus, the agents had probable cause to arrest Henderson.

■■■ We turn next to the search of Henderson's car. Although two weeks had passed since the March 13th robberies, giving Henderson two weeks to discard or destroy evidence of the crimes, it was reasonable for the agents to believe Henderson kept the clothes he used during the robberies and that those clothes would be found in his car. The agents knew that the Wig Bandit liked to reuse his disguises, especially his signature burgundy suit. And because the agents knew that Henderson was only visiting Las Vegas, they could reasonably believe it likely that he would have the suit in his luggage or unpacked in his hotel room. Consequently, when the agents observed Thompson moving Henderson's and her belongings out of their hotel room and into the rental car while checking out of the Marriott Hotel, the agents could reasonably believe that those belongings included evidence of the bank robberies. *See United States v. Reyes*, 792 F.2d 536, 540 (5th Cir.1986). Moreover, after the agents took Henderson and Thompson into custody, and before the rental car was searched, Thompson told the agents that there was a gun in the car. Given that the Wig Bandit used a handgun, the agents had yet another reason to believe evidence of the crime was located in the car. Thus, the totality of the circumstances provided probable

cause to believe the car contained evidence of the robberies. *See California v. Acevedo,* 500 U.S. 565, 580, 111 S.Ct. 1982, 114 L.Ed.2d 619 (1991).

▬▬▬ Because the agents had probable cause to search the car, and the automobile exception to the warrant requirement applies, the search was valid.[1] *See Acevedo,* 500 U.S. at 580, 111 S.Ct. 1982; *Ross,* 456 U.S. at 824, 102 S.Ct. 2157. This authority did not evanesce simply because the officers decided to impound the car and search it later. *See United States v. Johns,* 469 U.S. 478, 484, 105 S.Ct. 881, 83 L.Ed.2d 890 (1985) (explaining that there is no requirement that a warrantless search of a vehicle occur contemporaneously with its seizure); *Michigan v. Thomas,* 458 U.S. 259, 261, 102 S.Ct. 3079, 73 L.Ed.2d 750 (1982) (per curiam) ("[T]he justification to conduct such a warrantless search does not vanish once the car has been immobilized."). Likewise, because the officers were entitled to engage in a warrantless search of the car, it is irrelevant that in eventually issuing a warrant for the search of the car the magistrate relied on observations Agent Friedrich made while Thompson was rummaging through the car for her belongings.

### III

▬▬▬ Henderson moved for a second evidentiary hearing on the issue of probable cause for his arrest. He wanted to challenge the testimony of Agents Dockery, Schlumpf and Calhoun given at the initial hearing, at which they swore that before they arrested him they compared the surveillance photographs taken during the Las Vegas bank robberies with Henderson's mug shot obtained from the LVMPD. Henderson's proffer was that the agents did not *actually* compare his booking photo with the surveillance photographs before they arrested him because they could not have received the booking photo from the LVMPD before his arrest. He was arrested on March 24, 1998 before 2:00 P.M. That morning the FBI had requested Henderson's booking photo from the LVMPD.

In support of his proffer, Henderson presented the affidavit of an investigator who stated orders for booking photos "usually" were not ready for pick-up before 2:00 P.M. and Henderson's booking photo was scheduled for pick-up at that time. The LVMPD technician responsible for processing photographs could not say when Henderson's mug shot was picked up.

Henderson's proffer did not create a genuine issue of material fact requiring an evidentiary hearing. His investigator did not say when Henderson's booking photo

---

1. The government never explicitly argued that, at the time of Henderson's arrest, the agents had probable cause to search his car to find evidence of the robbery, relying instead on an inventory search of an impounded vehicle, inevitable discovery and a search incident to Henderson's arrest. In *United States v. Salazar,* 805 F.2d 1394 (9th Cir.1986), *overruled on other grounds by Acevedo,* 500 U.S. at 565, 111 S.Ct. 1982, we observed that while we generally may affirm "on any basis fairly presented by [the] record that, as a matter of law, sustains the judgment," *Salazar,* 805 F.2d at 1399 (citing *United States v. Burnette,* 698 F.2d 1038, 1048 (9th Cir.1983)), "we cannot uphold [a] conviction based on a theory raised sua sponte as it would deprive [the defendant] of the opportunity to adduce evidence in his favor." *Salazar,* 805 F.2d at 1400 (citing *Giordenello v. United States,* 357 U.S. 480, 78 S.Ct. 1245, 2 L.Ed.2d 1503 (1958)); *see also United States v. Parr,* 843 F.2d 1228, 1232 (9th Cir.1988). *Salazar, Giordenello* and *Parr* are inapplicable to the present case. Here, upholding the search of Henderson's car on the basis of probable cause for the search does not "unfairly deprive [him] of the opportunity to adduce evidence" on that theory. *Cf. Parr,* 843 F.2d at 1232; *Salazar,* 805 F.2d at 1399–1400; *Giordenello,* 357 U.S. at 488, 78 S.Ct. 1245. Henderson has fully litigated all of the facts pertaining to probable cause for his arrest and probable cause for the search of his car. All of the evidence is in the record and all of the relevant facts have been resolved. In this circumstance, we conclude we are not foreclosed from affirming the district court on the probable cause ground.

was actually picked up. In fact, the affidavit implied that sometimes booking photos were ready before 2:00 P.M. Moreover, the government submitted an affidavit from Agent Ryan who swore that four to five times per month she was able to pick up photographs from the LVMPD within fifteen minutes of a request. She could not say when she picked up Henderson's mug shot, but Agents Dockery, Schlumpf and Calhoun swore that they had Henderson's mug shot in hand and compared it with the bank surveillance photographs before they arrested him. On this showing, the district court was not obliged to hold an evidentiary hearing on the question of just when on March 24th the FBI obtained Henderson's booking photo from the LVMPD. *See United States v. Wilson*, 7 F.3d 828, 834–35 (9th Cir.1993); *United States v. Chavez–Marquez*, 66 F.3d 259, 261 (10th Cir.1995).

### IV

■■■ Henderson also contends the trial court erred when it denied his request to present an alibi witness. The district court excluded the testimony because Henderson failed to give the government timely notice that he intended to call an alibi witness.

Federal Rule of Criminal Procedure 12.1 permits a district court to exclude the testimony of an alibi witness when the defendant has failed to timely disclose the witness. *See* Fed.R.Crim.P. 12.1(d). Here, Henderson did not advise the government of the alibi witness until the third day of his four-day trial. This was a violation of both Rule 12.1 and a pre-trial agreement between the parties. Although Henderson claimed the delay was due to his reluctance to call the witness given her personal problems, the district court was not required to credit this excuse nor consider it sufficient to override Rule 12.1. *Cf. Eckert v. Tansy*, 936 F.2d 444, 446–47 (9th Cir.1991).

■■■ Nor did the district court err by not requiring any showing of surprise or prejudice to the government. A trial court may reject testimony of an alibi witness when it finds that the defendant has willfully failed to follow procedural rules applicable to the presentation of such evidence. *See Taylor v. Illinois*, 484 U.S. 400, 414–15, 108 S.Ct. 646, 98 L.Ed.2d 798 (1988); *Eckert*, 936 F.2d at 447. Here, the district court found that Henderson's Rule 12.1 violation was motivated by an attempt to gain "a tactical advantage that would minimize the effectiveness of cross-examination, and the ability of the government to present rebuttal evidence." We conclude the district court did not abuse its discretion when it barred Henderson from calling his alibi witness.

### V

■■■ Henderson next contends the district court abused its discretion when it allowed Detective Hammack to testify that, based on his review of surveillance photographs of the robbery of the Bank of America on January 16th, Henderson was the robber depicted in those photographs. *See Old Chief v. United States*, 519 U.S. 172, 174 n. 1, 117 S.Ct. 644, 136 L.Ed.2d 574 (1997); *United States v. Ramirez*, 176 F.3d 1179, 1182 (9th Cir.1999).

■■■ A lay witness may give an opinion regarding the identity of an individual depicted in a photograph provided the witness has had "sufficient contact with the defendant to achieve a level of familiarity that renders the lay opinion helpful." *United States v. Henderson*, 68 F.3d 323, 326–27 (9th Cir.1995) (holding that an officer's testimony would be helpful to the jury because he had known the defendant for fifteen years and had seen him in a heavy overcoat—a garment worn by the bank robber); *United States v. Butcher*, 557 F.2d 666, 667 n. 3 (9th Cir. 1977) (finding no abuse of discretion when the trial court admitted testimony from several witnesses who had observed the defendant on multiple occasions or had

total exposure to him for at least two hours). While a witness need not have specialized knowledge of a defendant's appearance that is unavailable to a jury, *Henderson*, 68 F.3d at 326, such knowledge makes an identification particularly valuable. *See id.; United States v. Langford*, 802 F.2d 1176, 1179 (9th Cir.1986). Here, Detective Hammack's testimony was especially helpful to the jury. Detective Hammack was familiar with Henderson because he had known him more than four years and had seen him more than one hundred times. Detective Hammack also had special knowledge of Henderson's appearance; he had seen Henderson wear a suit and hat similar to those worn by the robber depicted in the January 16th robbery surveillance photographs. *See Henderson*, 68 F.3d at 326. Detective Hammack's testimony was admissible.

■ Henderson argues that nonetheless Hammack's testimony should have been excluded under Rule 403. *See* Fed. R.Evid. 403. We disagree. Although there is a danger of unfair prejudice whenever an officer identifies a defendant because "[the defendant is] presented as a person subject to a certain degree of police scrutiny," *Butcher*, 557 F.2d at 669, there is no per se rule against such testimony. *See Henderson*, 68 F.3d at 327. Rather, a court should consider "the interrelationship of lay identifications by police officers, other identification evidence, and the probative value requirement of Federal Rule of Evidence 403." *Id.* "[I]f the only identification evidence is the officer's lay opinion testimony … a district court will not abuse its discretion if it determines the probative value of the evidence outweighs its prejudicial effect." *Id.* In the present case, none of the eyewitnesses to the January 16th robbery could identify Henderson as the bank robber. Detective Hammack was the only witness who could offer such identification testimony, and the court determined that the probative value of his testimony outweighed its prejudicial effect. The district court did not abuse its discretion by admitting Detective Hammack's testimony.

## VI

■ Relying on *Neil v. Biggers*, 409 U.S. 188, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972), Henderson contends the district court should have excluded the identification testimony of Campisi and Wade, the eyewitnesses to the two robberies on March 13th, because their testimony was unreliable. We disagree.

■ To successfully challenge identification testimony under *Biggers*, a defendant must show that the government's pretrial or in-court identification procedures were so unnecessarily suggestive as to give rise to a substantial likelihood of misidentification. *See Biggers*, 409 U.S. at 198, 93 S.Ct. 375; *United States v. Valenzuela*, 722 F.2d 1431, 1432, 1433–34 (9th Cir.1983) (citation omitted). Henderson has made no showing that any of the government's identification procedures were unduly suggestive. *See United States v. Bagley*, 772 F.2d 482, 493 (9th Cir.1985). His *Biggers* challenge fails.

## VII

■ Henderson next argues that the trial court erred when it denied his motion for acquittal on Counts Two and Three of the indictment. These counts charged him with the two March 13th bank robberies. We review de novo a district court's denial of a motion for acquittal. *See United States v. Yossunthorn*, 167 F.3d 1267, 1270 (9th Cir.1999). We consider the evidence "in the light most favorable to the government to determine if 'any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *United States v. Shirley*, 884 F.2d 1130, 1134 (9th Cir.1989) (citation omitted).

Henderson contends no reasonable trier of fact could have found him guilty of the crimes alleged in Counts Two and Three because the testimony at trial showed that those two robberies occurred at the same time. Henderson misconstrues the evidence. Campisi gave conflicting testimony as to when the Bank of America at 1380 East Flamingo was robbed. She first tes-

tified it was robbed at 5:45 P.M., but later testified it was robbed at 5:53 P.M. She ultimately admitted she was not certain of the time of the robbery. Similarly, although Megan Moulton, an employee of Wells Fargo Bank, testified on cross-examination that the Wells Fargo branch where she worked at 4720 South Eastern Avenue was robbed at approximately 5:54 P.M., she clarified on re-direct that this was only an approximation, and that she was only sure that the robbery occurred just before the bank closed at 6:00 P.M. In short, both witnesses only estimated the time of the robberies. It is also worth mentioning that Henderson himself testified that one person, McGee, committed both robberies. The evidence did not foreclose a finding that Henderson committed the two robberies.

## VIII

 Finally, Henderson argues he is entitled to a new trial because of prosecutorial misconduct during closing argument. Henderson did not object when the prosecutor made the statements he complains of. Accordingly, Henderson must show that the district court plainly erred when it did not intervene sua sponte to address the alleged misconduct. *See United States v. Vences,* 169 F.3d 611, 613 (9th Cir.1999).

▉▉▉ When prosecutorial misconduct is alleged, "the issue is whether, considered in the context of the entire trial, that conduct appears likely to have affected the jury's discharge of its duty to judge the evidence fairly." *United States v. Frederick,* 78 F.3d 1370, 1379 (9th Cir. 1996) (citation omitted); *see also United States v. Young,* 470 U.S. 1, 11, 105 S.Ct. 1038, 84 L.Ed.2d 1 (1985). Prosecutors have considerable leeway to strike "hard blows" based on the evidence and all reasonable inferences from the evidence. *See Berger v. United States,* 295 U.S. 78, 88, 55 S.Ct. 629, 79 L.Ed. 1314 (1935), overruled

on other grounds, *Stirone v. United States,* 361 U.S. 212, 80 S.Ct. 270, 4 L.Ed.2d 252 (1960); *United States v. Rude,* 88 F.3d 1538, 1548 (9th Cir.1996) (citing *United States v. Baker,* 10 F.3d 1374, 1415 (9th Cir.1993)).

▉▉ Henderson argues the prosecutor improperly questioned his character for truthfulness by suggesting that he had an excuse for everything and that he was trying to "skirt the law—just like he tries to skirt everything else."[2] This argument fails. It is not improper for a prosecutor to challenge the credibility of a testifying defendant by calling into question the defendant's version of events, and in doing so to suggest that the defendant has "excuses for everything." *See United States v. Nash,* 115 F.3d 1431, 1439 (9th Cir.1997). As to the "skirt the law" statement, it was reasonably descriptive and not so pejorative that it served no purpose other than to incite prejudice. *See Rude,* 88 F.3d at 1548.

AFFIRMED.

---

2. Henderson also contends the prosecutor impermissibly vouched for Willie McGee. But McGee never testified. Accordingly, it was

not vouching. *See United States v. Garcia–Guizar,* 160 F.3d 511, 520 (9th Cir.1998).